**Richmond.**

BIBB'S ADM'R v. N. & W. R. R. COMPANY.

February 12th, 1891.

1. EMPLOYER—*Contractor—Negligent injuries—Liability.*—Where employer selects with due care a competent contractor, and to him commits a work that is lawful, and such as may be done without injury to third persons, and to be done in a workmanlike manner, at a stipulated price, such employer cannot be held liable for injuries caused by the negligence of such contractor or his servants to third persons, not servants of such employer nor passengers on his cars.

2. INDEPENDENT CONTRACTOR is one who renders service in the course of an occupation, and represents the will of his employer only as to the result of his work, and not as to the means whereby it is accomplished, and is usually paid by the job.

3. IDEM –*Supervision.*—The reservation to the employer of the privilege of inspecting and supervising the work of the contractor does not destroy or impair his character as an independent contractor.

4. MASTER AND SERVANT.—The rule of *respondeat superior* applies only to cases where the relation of master and servant exist, and does not apply as between an employer and the servants of an independent contractor. And the same is true of the rule of *qui facit per alium, facit per se.*

5. CASE AT BAR.—Railroad company employs, for an agreed price, a skillful contractor to repair, according to specifications and with privilege reserved of supervision by its engineer, a bridge in such a manner that the passing of its trains should not be prevented, but they were not to pass except upon signal from contractor's foreman. On day of accident, upon such signal, a train was proceeding across the bridge, when the engine broke down one of the spans, and falling, killed the plaintiff's intestate, who was a servant of the contractor and engaged at the time

in working on the bridge: *held*, the railroad company is not liable for the injury.

6. Cases Examined and Disapproved.—*Hole* v. *S. & S. Railway Co.*, 6 H. & N., 488, and *City of Chicago* v. *Robbins*, 2 Black (U. S. R.), 418.

7. Cases Examined and Approved.—*Britter* v. *Hunter*, 7 H. & N., 826, and *Scammon* v. *City of Chicago*, 25 Ill., 424.

Error to judgment of corporation court of Roanoke City, rendered March 10th, 1888, in an action on the case brought in said court in November, 1887, by J. A. Page, administrator of S. S. Bibb, deceased, against the Norfolk and Western Railroad Company, to recover damages for the alleged killing of the plaintiff's intestate by the carelessness of the defendant company in running one of its trains in and upon a certain bridge over Big Otter river in the county of Bedford, and on the line of said railway, and then in course of construction by one Fred. H. Smith, who had contracted with said company to erect same, the plaintiff's intestate being at the time in the employ of said contractor, and engaged at work in and upon said bridge.

The declaration contains three counts, the first of which, as originally drawn, was, on demurrer, held to be defective, and thereupon the plaintiff substituted a new first count. This count sets forth in substance that "the said defendant undertook to rebuild, replace and repair a certain bridge, the same being a part and parcel of the line of road aforesaid across Big Otter river, in the county of Bedford in said State, and thereupon made a contract with one Fred. H. Smith for the erection of said bridge, by the terms of which contract it was agreed, amongst other things, on the part of the said defendant, that said defendant would furnish suitable and proper materials for the erection of said bridge, and that it would use due and proper care in the running of its trains and engines in and upon said bridge; and the said Smith, on his part, agreed, amongst other things, to erect and place said bridge across said

stream." This count then proceeds to set forth that the plaintiff's intestate was employed by Smith to work on the bridge, and charges that the defendant company did not furnish suitable and proper materials for said bridge, and did not use due and proper care in running its engines and trains upon said bridge, "but on the contrary furnished improper and defective materials, and on the — day of March, 1887, while said Bibb was so employed about said work, caused its trains to run upon said bridge, so that the same was broken down and fell in and upon said Bibb," &c. This count, thus substituted for the original first count, was also demurred to, but the demurrer was overruled.

The second count in the declaration differs from the first only in this, that it confines the negligence and wrong charged to the careless *manner* in which the defendant company caused its engine and train to be propelled in and upon the bridge.

The third count charges that the wrong and negligence of the defendant company consisted in the act of running the train upon said bridge when it was in an incomplete and dangerous condition, and when it was not properly and sufficiently supported with timbers, braces and trestles.

To this declaration the defendant pleaded "not guilty," and upon the issue joined upon that plea the case was tried. Pending the trial the plaintiff took several bills of exceptions to rulings of the court touching certain instructions asked for by him.

The jury returned a verdict for the defendant, and thereupon the plaintiff moved the court to set aside the verdict as being contrary to the law and the evidence, and to grant him a new trial; but the court overruled the motion and entered judgment according to the verdict of the jury, and to this action of the court the plaintiff also excepted, and in this bill of exceptions the court certifies not the evidence, but the facts proved; and the case is here upon a writ of error to said judgment allowed by one of the judges of this court.

*Penn and Cocke*, for the plaintiff in error.

*T. J. Kirkpatrick* and *S. Griffin*, for the defendant in error.

RICHARDSON, J. (after stating the case) delivered the opinion of the court.

This case, which was pending at the place of session of this court at Wytheville, was removed therefrom to its place of session in Richmond, and was, upon full argument, heard by this court at the November term thereof, 1890, when the judgment of the court below was affirmed by an evenly divided court of four judges. Upon the application of the plaintiff in error a rehearing was granted, and the case was again heard by this court at its November term, 1890, at Richmond, all the judges being present.

The plaintiff's case as urged before the court below, is fairly presented in his three bills of exception taken pending the trial to certain rulings of that court. The real case at large, is presented in the plaintiff's bill of exceptions taken to the action of the court overruling his motion to set aside the verdict of the jury and grant a new trial; and in which the court certifies the facts proved. This exception is, in the record, entitled "Plaintiff's bill of exceptions No. 1," when in the natural and logical order of things, it should have been designated as his fourth and last. But this irregularity is not material, as the exception contains the court's certificate of the facts proved, and upon which, in the views taken of the case, the decision must mainly, if not entirely, turn.

The substantial and material facts, certified by the court as proved, are these:

The Norfolk and Western Railroad Company, during the fall and winter of 1886–'7, contracted with Fred. H. Smith for the erection of an iron bridge over Big Otter river, in Bedford County, Virginia, and in the line of said company's railway.

Smith was a professional and practical bridge builder, had large experience in erecting such structures, and as sole contractor and also as co-contractor with the Edgemore Iron Company, of Wilmington, Delaware, had erected several important bridges for this railroad company, and, among them, the high bridge across Appomattox river, which was built by said Edgemore Iron Company and said Smith as co-contractors with said railroad company. And subsequently Smith, as sole contractor with said railroad company, erected the Six-Mile bridge across James river below Lynchburg, the Ivy Creek bridge, and the Big Otter bridge, the one here in question.

That the iron taken from the old High bridge was used in the erection of other bridges in the line of said railroad, and among them, Big Otter bridge; and to adapt the old High bridge iron to that purpose it was cast and welded at the Roanoke Machine Works of the Norfolk and Western Railroad Company, and the iron so prepared, with all other materials for Big Otter bridge, was furnished by said railroad company, and with the material so furnished Smith was to build the bridge across Big Otter river, in place of the old bridge at that point, the work to be conducted and accomplished in such manner as not to interfere with the running of the company's trains during the erection of the new and the removal of the old bridge.

That the contract between the Norfolk and Western Railroad Company and F. H. Smith was partly in writing and partly parol, consisting in the main of correspondence by letters and by telegram. In making the contract the railroad company was represented by its chief engineer, W. W. Coe; and that, in a conversation between Smith and said chief engineer, it was agreed that the stipulations in the contract for the erection of the High bridge should, so far as applicable, continue in force as to the contract for the erection of Big Otter bridge.

That under the plans for the erection of Big Otter bridge, trestling was required all the way between the piers, or a carry

span was to be used to support the weight on the bridge while in course of construction. That in the erection of said bridge it was the understanding of Chief Engineer Coe that he had the right to criticise, both the method of erection and workmanship, but did not have the right to direct the methods in which the contractor should erect the bridge, and that he could have stopped the trains if he had known the condition of the bridge to be unsafe; that Maj. J. B. Goodwin was at the time in the engineering department of the railroad company and charged with the duty of inspecting and furnishing the materials for the bridge, and of reporting progress in the erection of the bridge to Chief Engineer Coe, and that he usually went to the bridge every day, and had the same right to criticise that Engineer Coe had; that he was there on the day of the accident, had been on the ground two hours, and left the bridge three minutes before the accident, and when the train was signalled to go forward, he was in the act of getting upon the caboose, with the intention of riding across, when he heard the crash, and went to the wreck.

In the certificate of facts proved there is set out at large the long correspondence, by letter and telegram, between Smith and Chief Engineer Coe, leading up to the contract in question, so much of which as is material will be hereinafter referred to. The most important part of this correspondence, and that which bears directly upon the contract for the erection of Big Otter bridge, is found in Smith's proposition, contained in his letter dated Baltimore, December 13th, 1887, addressed to Chief Engineer Coe at Roanoke, Va., in which, among other things, he wrote: "For the proposed rebuilding of Otter Creek (four spans) and Ivy Creek (three spans) by adopting and erecting 8 spans of old High bridge iron at Otter and 6 spans at Ivy, I will furnish drawings and advice for, and receive from you and unload at the bridge sites the permanent and temporary lumber and remodelled irons, and will erect the same for three thousand six hundred dollars

($3,600) for Otter Creek, and two thousand seven hundred dollars ($2,700) for Ivy Creek, payable in January, 1887, or later, if delays occur in the work." This proposition was afterwards accepted by the railroad company, and thus the parties came to an agreement.

The court further certifies that the railroad company never furnished materials for erecting trestles under the spans from pier to pier; that it furnished the necessary materials for a tressel next to each pier; that this would have left a space of sixty feet without tresseling; that Smith never made requisition for more material for tresseling; that the material furnished by the company was sufficiently strong to bear the strains to be put upon it; that the defendant used due care in the selection of the materials, and that the accident was not caused by any defect in said materials.

That all the force engaged in erecting the new bridge and removing the old one was employed and paid by Smith, the contractor; and that one T. P. Englesby was foreman under Smith and in charge of the erection of the bridge. That it was agreed between the parties that the railroad company's trains should not pass over the bridge during its erection until the signal to pass should be given by said Englesby.

That at the time of the accident the bridge, which consisted of four spans, was in course of construction, and the two eastern spans had been completed, and the third was so far completed that the old structure was being removed, the fourth and western span remaining intact; that the railroad company instructed all conductors of trains to stop at the bridge and to await the signal of Englesby before crossing, and to go forward when he notified them to do so.

That on the — day of March, 1887, the day of the accident, several lighter trains had passed safely over the bridge, a passenger train, going west, having passed only a short time before; that late in the afternoon of the day of the accident a heavy coal train arrived from the west, and halted near the

bridge about fifteen minutes, waiting for a signal to cross; that Bibb, who was an employee of Smith, the contractor, was, at the time, at work fitting and fastening the irons underneath the bridge; that about 5 o'clock P. M. Englesby, Smith's foreman, caused the signal to be given for the train to go ahead; that the signal was given by a colored man (whose name was not proven) employed by the railroad company to signal the trains under Englesby's instructions; that the train moved east at the rate of about three miles per hour.

That the bridge consisted of four spans, the two eastern spans of the old bridge having been cut away some time, and the new spans being in place; that the third span from the east was in an incomplete state, the old work having been that day cut away, the old work in the fourth span still being in place; that the train in question consisted of a consolidated engine, with its tender and — coal cars, with a caboose in the rear; that the engine, tender and one or two cars passed safely over the incomplete spans, and had gotten upon the third span from the west, when the two front wheels of truck were seen to jump the rails immediately over the pier where the old work and the new work joined, "when, and in a very short time, the span gave way and hurled the train in the chasm beneath, resulting in the death of six of Smith's employees, and among them S. S. Bibb, the plaintiff's intestate.

That at the time of the accident the span which fell was incomplete, the lateral braces, sway braces and struts not having been put in position; that the lateral braces are rods of iron which connect the chords of the bridge on either side by a net work crossing each other; that the sway braces are rods of iron which cross each other from top to bottom, connecting the top of one truss to the foot of the other; that the struts are rods of iron which, running at right angles across the bridge, connect the outer trusses between each set of lateral braces, which connect the same parts of the bridge by diagonal lines; that this bridge consisted of four trusses, the

outer ones on either side being intended to be connected, as above described, by lateral braces, sway braces and struts; that near the centre of the bridge were two other trusses, which were intended to double the strength of the bridge.

That at the time of the accident the floor beams, upon which were placed the rails, rested upon the outer trusses on either side, but did not rest upon the inner ones; that it was intended that blocks should be placed on each of the inner trusses, connecting them with the floor-timbers, that they might bear their part of the strain on the bridge; but that these blocks were not in position, and hence the inner trusses bore no part of the weight upon the bridge.

That it was proven that the lateral braces, sway braces and struts are important to strengthen the bridge, the former being intended to resist pressure from wind storm, and to hold the bridge rigid against the lateral vibrating motion which attends the moving of a train upon it, the struts as parts of the lateral brace system, and the sway braces to hold the trusses in perpendicular lines, and, by connecting the two, prevent either from swaying out of line.

That it was also proved that a span of bridge of the dimensions of the one in question would be very unsafe to run a train of cars upon if these lateral braces, sway braces and struts were not in position; that to run a train of coal cars upon such a bridge in such a condition would be foolhardy; that the bridge would be so unsteady that it would be liable to fall with the weight of such a train standing upon it; that with a moving train upon such a bridge any vibrating motion once started would continue to increase until the bridge would inevitably fall, there being nothing to resist such motion, except the floor timbers, which would not be sufficient for that purpose; and that the span in question fell under the weight of the train, because the lateral braces, sway braces and struts had not been placed in position.

It is also certified as a fact proved that Smith was an en-

gineer in good standing, was a practical bridge-builder, and
had been for a considerable time engineer for the Edgemore
Iron Company, of New Jersey, which was largely engaged in
the manufacture of iron bridges.

The former contract for the erection of the High bridge,
which, so far as applicable, was to continue in force as to the
erection of the Big Otter bridge here in question, is set out in
full in the certificate of facts proved. It is very long, and
only what follows has any bearing upon this case.

In that case the contractors furnished the materials for the
work, which was to be done for a stipulated price, and they
were to erect the bridge in the most substantial and workman-
like manner, and to the satisfaction and acceptance of the
chief engineer of the railroad company, the work to be done
and finished agreeably to the instructions of said company's
engineer or his assistants, and in accordance with the plans
furnished by the contractors and approved by said engineer,
which plans were made part of that contract.

That contract also contains the following *specifications:* "The
bridge to be proportioned for single track, with the trusses
twelve feet two and one-half inches, centre to centre, and for
sustaining with the dead weight of the structure the passage
of the following rolling load : Two consolidation engines, en-
train, weighing each 176,000 pounds, on a wheel base of 46' 5"
for each engine and tender, 96,000 pounds of the weight being
concentrated on a wheel base of 14' and followed by a train
weighing 3,000 pounds per lineal foot, with dead weight of
structure and above live load and a wind strain of 500 pounds
per lineal foot of structure strains in members not to exceed :
tension iron lateral braces 12,000 pounds per square inch; iron
chords and diagonals 10,000 pounds per square inch; steel chords
and diagonals 12,000 pounds per square inch. The whole of the
construction to be first class, and in strict accordance with the
drawings and these specifications. Free access is to be given
for the inspection of materials and workmanship, and all re-

quired test pieces are to be properly shaped and tested without charge."

Said High bridge contract also contains certain conditions, eight in number, the fifth and seventh of which only have any application to this case, and they are as follows:

"V. It is further covenanted and agreed between the said parties that the said parties of the first part shall not sub-let or transfer this contract, or any part thereof, to any person (except for the delivery of material) without the written consent of the engineer, but will, at all times, give personal attention and superintendence to the work."

"VII. The said parties of the first part have further covenanted and agreed to take, use, provide and make all proper, necessary and sufficient precaution, safeguards and protection against the occurrence or happening of any accidents, injuries, damages or hurt to any person or property during the progress of the construction of the work herein contracted for, and to be responsible for and to indemnify and save harmless the said party of the second part and the said engineer for the payment of sums of money by reason of all or any such accidents, injuries, damages, or hurt that may happen or occur upon or about said work, except said injuries arise from obeying the engineer's written orders, against the written protest of the party of the first part, and from all fines and penalties and loss incurred for and by reason of the violation of any city or borough ordinance or regulation or law of the State, while the said work is in progress of construction."

Such are the material facts certified by the trial court, and in the light of these facts, applying thereto the appropriate legal principles, we must determine whether there is error in the judgment of the court below. But before proceeding to consider the case on its merits, it is proper to dispose of two questions raised on demurrer in the court below, the rulings as to which are relied on as error in this court.

In the court below the defendant company demurred to the

first count in the plaintiff's declaration, which demurrer was sustained by the court; and it is insisted here that the court erred in that ruling. Without going into a careful analysis of the count demurred to, it is sufficient to say that it was plainly too vague and indefinite in its allegations to correctly inform the defendant company of the real case it was called on to meet. We are, therefore, of the opinion that the demurrer was properly sustained.

Subsequently, the declaration was amended by substituting a new count for the original first count in the declaration ; and to this substituted count the defendant also demurred, but the court overruled the demurrer; which action of the court the defendant in error relies upon as error here. Whilst it may be true that the count is somewhat awkwardly drawn, we are nevertheless of opinion that it is sufficient. It certainly, with sufficient details, states and sets forth when, where, in what manner, and under what circumstances the plaintiff's intestate met his death, and charges that the death resulted from the negligent and wrongful acts of the defendant company. This is sufficient; and we are of the opinion that the court did not err in overruling the demurrer to said first count as amended.

The question presented by the record before us is one of first impression in this State, and is one of great practical importance. It is whether a railroad company or any person, natural or artificial, who undertakes the erection or repair of a building, or other work for his own benefit, is responsible for injuries to third persons, occasioned by the negligence of a servant of the builder or the person who is actually engaged in erecting the building or other work, under an independent employment, or a general contract for that purpose.

Such is the general scope and bearing of the question presented. But in the light of the peculiar circumstances of the case in hand, the question is one of yet more special significance, and may be stated thus: Can the railroad company in

this case be held liable in damages for the death of the plaintiff's intestate, the latter, at the time of the accident which resulted in his death, being the employee and servant, not of the railroad company, but of one Fred. H. Smith, who was at the time in the exercise of an independent employment and engaged in erecting the bridge over Big Otter, under a contract with said company, the work to be done for a stipulated price for the job complete, the railroad company reserving no right of control as to the means and methods of doing the work contracted for?

The question thus stated presents in outline the case made by the pleadings and facts certified as proved, and upon which our decision must be based.

In order to the proper solution of the question above propounded, it is necessary in the first place to enquire into what constitutes an independent contractor. In Mechem's valuable work on Agency, he makes the following clear statement of the law: "The principal's liability for the acts of his agent, within the scope of his authority, depends upon the fact that the relation of principal and agent exists. It is the principal's will that is to be exercised; his purpose that is to be accomplished; his are the benefits and advantages which ensue. He selects his own agent, puts him in motion, and has the right to direct and control his actions. It is, therefore, just and proper that he should be responsible for what the agent does while so employed. When, however, the principal has not this right of control, a different rule prevails. Neither reason nor justice requires that he should be held responsible for the manner of doing an act when he had no power or right to direct or control the manner." Mechem on Agency, § 747. And in this connection the author quotes with approbation the remark of Baron Rolfe, in *Hobbit* v. *London and Northwestern Railway Co.*, 4 Exch., 255, that "the liability of any one, other than the party actually guilty of any wrongful act, proceeds on the maxim, ' *Qui facit per alium facit per se.*' The

party employing has the selection of the party employed, and it is reasonable that he who has made choice of an unskillful or careless person to execute his orders, should be responsible for any injury resulting from the want of skill or want of care of the person employed; but neither the principle of the rule, nor the rule itself, can apply to the rule when the party sought to be charged does not stand in the character of employer to the party by whose negligent act the injury has been occasioned." The same author further says: "If, therefore, the principal, using due care in the selection of the person, enters into a contract with a person exercising an independent employment, by virtue of which the latter undertakes to accomplish a given result, being at liberty to select and employ his own means and methods, and the principal retains no right or power to control or direct the manner in which the work shall be done, such a contract does not create the relation of principal and agent or master and servant, and the person contracting for the work is not liable for the negligence of the contractor, or of his servants or agents, in the performance of the work. The employment is regarded as independent when the person renders service in the course of an occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished." And the author further says: "The independent contractor is usually paid, in common parlance, by the job, but the fact that he is paid by the day does not necessarily destroy the independent character of his employment."

"This rule of immunity from liability," says the author, "is, however, subject to certain exceptions. No one can lawfully delegate to another the authority to do an unlawful act, nor can one upon whom the law imposes the performance of a duty, relieve himself from responsibility for its non-performance by committing its performance to a substitute. Thus if the thing to be done is in itself unlawful, or if it is *per se* a nuisance, or if it cannot be done without doing damage, he

who causes it to be done by another, be the latter servant, agent, or independent contractor, is as much liable for injuries which may happen to third persons from the act done, as though he had done the act in person." "So it is the duty," says the same author, "of every person who does in person, or causes to be done by another, an act which from its nature is liable, unless precautions are taken, to do injury to others, to see to it that those precautions are taken, and he cannot escape this duty by turning the performance over to a contractor. Of the same nature is the duty which the law imposes upon every person who, for his own purposes, brings on his lands, and collects or keeps them, anything likely to do mischief if it escapes, to keep it in at his peril; and if he does not do so, he is *prima facie* answerable for all the damage which is the natural consequence of its escape."

In stating the first branch of this proposition, the author was not as guarded in the language employed as he might, and, perhaps, should have been, in the light of the decided cases upon which he seems to have based his statement of the principle. The language, at first blush, seems to be open to the interpretation that every person, natural or artificial, who does in person, or causes to be done by another, work which from its nature is *liable*, unless precautions are taken, to do injury to others, must see to it in person that the necessary precautions are taken, and cannot escape liability for the non-performance of such duty by turning the whole performance over to a contractor, although the employer has exercised proper care in the selection of a skillful and competent person, exercising an independent employment, and has contracted with such person for the execution of the entire work by the means and methods of his own selection. Work is constantly being performed by independent contractors, as well as others, which in the nature of things *may*, in the course of its execution, result in injury to others; but it by no means follows that an employer in any such case must personally supervise the work

and see that the necessary precautions are taken, and that, for his failure to do so, he must be held liable in damages for injuries to other persons. For if, in the nature of things, the mere *liability* of the work to result in injury to some one be made the test, then it is obvious that the line of distinction becomes shadowy and indistinct between acts which are unlawful, or are *per se* nuisances, or that cannot be done without doing damage, and those the performance of which not only may, but in the nature of things must often be committed to others; as is the case with a railway company in the construction and repair of its roadway, bridges, and other structures.

This view seems to be in unison with the real meaning of the author himself, if we are to judge by the decided cases to which he refers; for immediately in connection with his statement of the distinction now under consideration, he makes this remark: "This distinction has been stated in a recent case as follows" (referring to and quoting the language of Powers, J., in *Bailey v. Troy and Boston R. R. Co.*, 57 Vt., 252), where it is said: "If the work to be done is committed to a contractor to be done in his own way, and is one from which, if properly done, no injurious consequences to third persons can arise, then the contractor is liable for the negligent performance of the work. If, however, the work is one that *will* result in injury to others unless preventive measures be adopted, the employer cannot relieve himself from liability by employing a contractor to do what it was his duty to do to prevent such injurious consequences. In the latter case, the duty to so conduct one's own business as not to injure another continuously remains with the employer."

There is manifestly broad distinction between the statement of the author (Mechem) and that of the Judge whose language is quoted as illustrating the distinction stated by the former. In the former the author makes the fact that the act to be performed is, in its nature, *liable* to result in injury to others the test; while the Judge, whose language is quoted, applies as the

test the fact that the work is one that *will* result in injury to others unless preventive measures be adopted.

But we find the principle nowhere more justly, clearly, and satisfactorily stated than in 2d Wood's Railway Law, § 284, pp. 1012–13, where the author, quoting the language of Appleton, J., in *Eaton* v. *European and Northern R. R. Co.*, 59th Me. 520 (8th Am. Rep., 430), says: "When the contract is to do an act in itself lawful, it is presumed it is to be done in a lawful manner. Unless, therefore, the relation of master and servant exist, the party contracting is not responsible for the negligent or tortuous acts of the person with whom the contract is made, especially if those acts are outside of the contract. If the injury was the natural result of work contracted to be done, and it could not be accomplished without causing the injury, the person contracting for doing it would be held responsible." The same author then proceeds to say: "If the company can be said to have co-operated in the act which produces the injury, it is liable; and this is always the case when the act must necessarily be productive of a nuisance;" citing *Houston, &c., R. R. Co.* v. *Meador*, 50th Tex., 77; *Robinson* v. *Webb*, 81 Bush (Ky.), 464; *Ellis* v. *Sheffield Gas Co.*, 2 El. and Bl., 767; *Penley* v. *Rowland*, 13 C. B., 867; *Hobbit* v. *London, &c., Ry. Co.*, 4 Exchq., 454; *King* v. *N. Y. Central R. R. Co*, 66 N. Y., 181; *Congreve* v. *Morgan*, 5th Duer (N. Y.), 495; and the author adds the remark: "In all cases it will be presumed that the act was to be done in a lawful manner, and with proper care and skill."

The principle just stated is well illustrated by the case of *Readie* v. *The London and Northwestern Railway Co.*, reported with *Hobbit* v. *London, &c, Ry. Co., supra*. In that case the railway company had let out, by contract, the building of a viaduct, which was a part of their railway, to contractors. Through the negligence of the men employed by the contractors, a heavy stone was dropped from the work, and falling upon the plaintiff's husband, who was lawfully passing along

the highway, killed him, and in an action by the wife for this injury, it was held that the company was not liable.    And, in delivering the opinion of the court, Baron Rolfe used this language:    "The liability of any one, other than the party actually guilty of any wrongful act, proceeds on the maxim *qui facit per alium facit per se.*    The party employing has the selection of the party employed, and it is reasonable that he who has made choice of an unskillful or careless person to execute his orders should be responsible for any injury resulting from the want of skill, or want of care in the person employed; but neither the principle of the rule, nor the rule itself, can apply to a case where the party sought to be charged does not stand in the character of employer to the party by whose negligence the injury has been occasioned "; and the learned baron, in support of the view thus presented, referred to the concurring cases of *Quarman* v. *Burnett,* 6th M. & W., 497; *Rapson* v. *Cubitt,* 9th M. & W., 709 ; and *Milligan* v. *Wedge,* 12th Adol. & Ellis, 737, as settling the principle.    And then, in recognition of the same principle, laid down by Littledale, Justice, in *Laugher* v. *Pointer,* 5th Barn. & Cress., 560, the same learned baron remarked, in substance, that to decide that the railway company was liable, would be equivalent to deciding that the contractors, whose servant did the injury, were not liable, a proposition which could not be maintained.

*Laugher* v. *Pointer, supra,* was an action to recover damages for an injury done to a horse of the plaintiff, by the negligence of another person under these circumstances: The defendant owned a carriage and hired of a stable keeper a pair of horses and a driver, to draw it for a day, or a short time.    The injury for which the suit was brought was the result of the carelessness of the driver, while the defendant was riding in the carriage.    The plaintiff brought his action against the owner of the carriage.    The judge before whom the cause was tried non-suited the plaintiff; and a strong attempt was made for a new trial, both in the King's Bench and Exchequer Chamber,

which failed on account of a disagreement among the judges
in both courts, as to the question whose servant the driver was
that did the injury, whether in the act of driving he was the
servant of the defendant, who was riding in the carriage, or
of the stable keeper, who sent him with the horses to draw it.
In this case, Tittledale, J., put his opinion, that the owner of
the carriage was not liable for the injury done to a third
person by the negligence of the driver, on the ground that the
driver could not be the servant of both the stable keeper and
the owner of the carriage; and the learned judge remarked
that the driver "was the servant of one *or* the other, but not
the servant of one *and* the other; that the law did not recog-
nize a several liability in two principals.

*Quarman* v. *Burnett and others*, 6 M. & W., 497, is the case
of *Laugher* v. *Pointer* over again. In that case the defendants,
who were the owners of the carriage, hired a pair of horses
from another person, and a driver to drive them to the car-
riage for a short time, during which an injury was done to the
plaintiff's horse and chaise by the carelessness of the driver,
for which the owner of the horse and chaise brought his action
against the owners of the carriage. The defendants pleaded,
first, not guilty; second, that the carriage and horses, or either
of them, were not under the care of the defendants. Upon the
trial the jury found a verdict for the plaintiff, and the judge
reserved the liberty to move to enter a non-suit. On the de-
cision of this motion, Baron Park delivered the opinion of the
court, which was that the defendants were not liable, and that
a rule be made absolute to enter a verdict for them. In the
course of his very able opinion, the learned baron says, that
"upon the principle that, *qui facit per alium facit per se*, the
master is responsible for the acts of his servant: and that
person is undoubtedly liable, who stands in the relation of
master to the wrong-doer; he who had selected him as his
servant from the knowledge of, or belief in his skill and care,
and who could remove him for misconduct, and whose orders

he was bound to receive and obey. But the liability, by virtue of the relation of master and servant, must cease, when the relation itself ceases to exist; and no other person than the master of such servant can be liable, on the simple ground that the servant is the servant of another, and his act the act of another."

The decision in *Quarman* v. *Burnett*, was approved of and followed in *Rapson* v. *Cubitt*, 9 M. & W., 709, and in the case of *Readie* & *Hobbitt* v. *London & Northwestern Ry. Co.*, *supra*, and in a great many later English cases; and the doctrine of these cases was adopted by Judge Story in his Commentaries on the Law of Agency, 2d ed , § 453, B. And the same principles, especially as laid down by Lord Tenterden and Tittledale, J., in *Laugher* v. *Pointer*, and by Baron Park in *Quarman* v. *Burnett*, were recognized and followed by this court in *Muse* v. *Stern*, 82 Va. R., 33, without any qualification whatever. See opinion of Hinton, J., in that case.

*Milligan* v. *Wadge*, 12th Adol. & Ellis, 737, is another case that powerfully illustrates the propriety of the rule that exempts an employer from liability for injuries resulting from the carelessness of an independent contractor, or his agents or servants, where the employer has exercised due care in the selection of a competent and skillful contractor, who employs and pays his own workmen, who are subject to his orders only, and who does the work by means and methods of his own selection. In that case, the rule of *respondeat superior* was fully and ably considered, upon these facts: The defendant, who was a butcher, had bought a bullock at Smithfield market, in the city of London, where persons who drive cattle for others are required to be licensed. The butcher employed a licensed drover to drive the bullock to the slaughter house, which was within the bounds of the city. The drover employed a boy to drive the ox, who conducted the matter so negligently that he permitted the ox, as he was passing by the plaintiff's show-room, in which he had marble chimney pieces,

&c., for sale, to run into the show-room and break the chimney pieces, for which injury the plaintiff sued the butcher. The judge before whom the case was tried, was of opinion that the boy was not the servant of the defendant. In that case, Williams, J., said: "The difficulty always is, to say whose servant the person is that does the injury; when you decide that, the question is solved."

In the leading New York case of *Blake* v. *Ferris*, 1st Selden, 48, it was held that where persons having a license or grant to construct, at their own expense, a sewer in a public street, engage another person to construct it, at a stipulated price for the whole work, they are not liable to third persons for any injury resulting from the negligent manner in which the sewer may be left at night, by the workmen employed in its construction; that the *immediate employer* of the agent or servant, through whose negligence an injury occurs, is the person responsible for the negligence of such agent or servant, and that to him the principle *respondeat superior* applies.

In that case, the opinion—a very able one—was delivered by Judge Mullet; in the course of which he says: "The rule of *respondeat superior*, as its terms imply, belongs to the relation of superior and subordinate, and is applicable to that relation wherever it exists, whether between principal and agent, or master and servant, and to the subjects to which that relation extends, and is co-extensive with it, and ceases when the relation itself ceases to exist. It is founded on the power which the superior has a right to exercise over the acts of his subordinates. Therefore the rule cannot be applicable to cases where no such power exists. The absolute and direct co-incidence and co-existence of the rule *respondeat superior* with the relation to which it is applicable, and to the subject-matter to which that relation extends, is an important proposition in determining the applicability of the rule;" citing, as illustrations, all the cases above referred to, and adding the remark that all of these cases are cited with approbation by Mr. Jus-

tice Story, in his Commentary on Agency, sec. 453, A, B, and C.

The American authorities, holding substantially the same doctrine, are too numerous for convenient citation—some of which will hereinafter be referred to. In fact, we may safely venture the remark, that upon a careful examination of all the authorities, applying to them the tests of right reason and common justice, and looking at them in the light of sound, well-settled principles, no well-considered case will be found holding a different doctrine.

It is not claimed that there is that uniformity in the decided cases which is always so much to be desired. On the contrary, there are a number of cases in irreconcilable conflict with each other, and with the cases above referred to; but the overwhelming weight of authority is in accord with the cases above referred to.

It is safe to say that, while other causes have contributed to this conflict in the decided cases, it originated in the erroneous and monstrous doctrine held in the old English case of *Bush* v. *Steinman*, 1st Bos. & Pul., 404, in which A., having a house by the roadside, contracted with B. to repair it for a stipulated sum; B. contracted with C. to do the work; C. with D. to furnish the materials; the servant of D. brought a quantity of lime to the house, and placed it in the road, by which the plaintiff's carriage was overturned, and he was injured. The court held that A., the owner of the house, was answerable for the damage sustained. Thus the owner of the property, notwithstanding he had let the work to a contractor, was held liable for absurdly remote and inconsequential damage. But for the authoritative report of the case, it could scarcely be believed that any court of high authority ever made a decision so utterly opposed to reason and justice. But that case was decided near one hundred years ago, when many crude doctrines were advanced that are now disregarded as unsound, misleading, and unjust. The doctrine of that case, from its

inception, met with stern resistance from bench and bar. In
subsequent English cases, it was sometimes urged as the set-
tled law of that country, but was doubted and avoided by the
English judges; in others, it was not referred to by either
counsel or court; and, finally, after a somewhat equivocal con-
troversy, lasting some fifty years, it was entirely overturned
and repudiated in the case of *Readie, &c.* v. *London and North-
western Railway, supra;* in which Baron Rolfe said that "ac-
cording to the modern decisions, *Bush* v. *Steinman* must be
taken not to be law, or, at all events, that it cannot be sup-
ported on the ground on which the judgment of the court pro-
ceeded."

The contest was renewed in this country, and in *Hilliard* v.
*Richardson,* 3d Gray, 349, in an exceedingly able opinion, by
Judge Thomas, expressing the unanimous opinion of the
supreme court of Massachusetts, all the authorities, American
and English, were elaborately and ably reviewed, and the doc-
trine of *Bush* v. *Steinman,* was repudiated out and out, it being
demonstrated that that case promulgated a doctrine which
had no existence. in England prior to that decision, and that
it was not law in either England or America; and the supreme
court of Massachusetts held that the owner of land, who em-
ploys a carpenter, for a specific price, to alter and repair a
building thereon, and to furnish all the materials for this pur-
pose, is not liable for damages resulting to a third person from
boards deposited in the highway in front of the land by a
teamster in the employ of the carpenter, and intended to be
used in such alteration and repair. This case of *Hilliard* v.
*Richardson,* is entitled to peculiar weight and influence, not
only by reason of the carefully considered and able opinion
delivered by Judge Thomas, but because it was decided by a
bench of judges presided over by that eminent jurist, Chief
Justice Shaw.

The character of the decisions in conflict with those above
referred to, and the untenable ground upon which they rest,

may be well illustrated by a brief comparison, first, of two English cases, *Hole* v. *Sittingbourne and Sherness Ry. Co.*, 6th H.. & N., 488, and *Butler* v. *Hunter*, 7th H. & N., 826, and, second, of two American cases, *Scammon* v. *City of Chicago*, 25 Ill., 424, and *City of Chicago* v. *Robbins*, 2 Black (U. S. R.), 418.

*Hole* v. *Sittingbourne, &c., Ry. Co.*, was a case in which the defendant company was authorized by act of Parliament to construct a draw-bridge across a navigable stream, the act providing that it should not be lawful to detain any vessel navigating the river for a longer time than was necessary to enable any carriages, animals or passengers, ready to traverse, to cross the bridge, and for opening it to admit such vessel. The defendant company employed a contractor to construct the bridge, and by some defect in the construction of the draws the·bridge could not be opened, and the plaintiff's vessel was thereby prevented from navigating the river, and the court held that the defendant company was liable. The opinion was delivered by Pollock, C. B., who, in the course of his opinion said: "Where a person is authorized by act of Parliament or is bound by contract to do particular work, he cannot avoid responsibility by contracting with another person to do that work; quoting the remark of Lord Campbell, in *Ellis* v. *Sheffield Gas Co.*, *supra*, where it was said: "It is a proposition absolutely untenable that in no case can a man be responsible for the act of a person with whom he has made a contract. *I am clearly of the opinion that, if the contractor does the thing which he is employed to do, the employer is responsible for that thing, as if he did it himself."*

No one will controvert the accuracy and justness of this remark of Lord Campbell; for, under the rule above laid down, if a man employ another to do an unlawful act, or an act that is *per se* a nuisance, he, of course, as well as the person who was employed and did the act would be liable; otherwise, if the act to be done was in itself lawful, and the injury resulted from

the carelessness of the contractor or his agents and servants. But the learned chief baron proceeds to say, in substance, " when the act complained of is purely collateral and arises incidentally in the course of the performance of the work, the employer is not liable, *because (italics the writer's) he never authorized that act; the remedy is against the person who did it.* But when the contract is to do a particular act, the doing of which produces mischief, another doctrine applies." What other doctrine is it, we ask, that then applies? None other than what is comprehended in any one of the prominent exceptions to the rule, above laid down, that exempts an employer, under certain circumstances, from liability for injuries resulting from the carelessness of a contractor or his agents or servants; for instance, if the act to be done is in itself unlawful, or if it is *per se* a nuisance, as if its performance must necessarily result in a nuisance, or cannot be done without damage to third persons, then, in either event, the employer is liable as much so as if he did the act himself. But Pollock, C. B. proceeds to say: "Here the legislature empowered the company to build the bridge; in building that bridge the *con tractor created an obstruction* to the navigation, and for that the company are liable." * * * * "So here, it was the duty of the company to see *how* the contractor was about to construct the bridge. They ought to have taken care to ascertain what he was about to do, what materials he would use, *and to have seen that the specifications and materials were such as would insure the construction of a proper and efficient bridge.* The learned chief baron was, however, careful to add: "But I do not rest my judgment on that ground, but simply on this, *that there is a distinction between mischief that is collateral and that which directly results from the act which the contractor agreed and was authorized to do.*"

This reasoning is palpably unsound, at variance with the remarks of Lord Campbell, quoted by the learned chief baron, and wholly inapplicable to the case under consideration. The

report of the case shows that the railway company let the work to be executed according to the requirements of the act of Parliament, and that the injury complained of occurred during the erection of the bridge, and before it was completed and turned over to the company. Though the report of the case does not show precisely how it occurred that the draw failed to open on that occasion, it is quite likely that for some unforeseen cause there was a mere temporary obstruction to the navigation; in which case common fairness would dictate a liberal construction of the statute in favor of the company, and even the contractor, the bridge being a work of public importance, superior to the interest of the private ship owner, whose vessel was only temporarily detained. But, however this may have been, Chief Baron Pollock puts his judgment upon the distinct, but untenable, ground that the mischief was the direct result of doing the thing which the contractor agreed to do and was authorized to do, when, as before stated, the company let the work to the contractor to be executed according to the requirements of the act of Parliament. What possible reason or excuse, then, could there have been for the ruling which, in effect, held that the railway company deliberately employed and authorized the contractor to do an unlawful act to construct the bridge so as to obstruct the navigation of the river. And strangest of all is, that the chief baron quotes, with approbation, the language of Lord Campbell, in *Ellis* v. *Sheffield Gas Co.*, *supra*, which by no means sustains the conclusion arrived at in *Hole* v. *Sittingbourne and Sherness Railway Co.;* the judgment in which cannot possibly be upheld on the ground upon which it was put; nor upon any now recognized principle or rule of decision.

One year later, the same learned judge, in the same court, decided the case of *Britter* v. *Hunter*, *supra*, in which, upon principle, he practically repudiated the doctrine held by him in the former case. In *Britter* v. *Hunter*, the defendant employed an architect to repair his house, and it became necessary to take

down and rebuild the front thereof; and the work was let to a builder. The plaintiff was the owner of the adjoining premises, between which and the defendant's house there was a party-wall, fourteen inches thick, and in front of defendant's house what is called a brest-summer, one end of which was inserted into the party-wall about six inches. In removing the front of the defendant's house the contractor's workmen removed the brest-summer, and not having shoved up the plaintiff's house, the front wall thereof fell, and he was considerably damaged thereby. It appeared that the work might have been done with safety if the wall had been shoved up, which was the ordinary and usual precaution adopted in such cases, and the court held that the defendant could not be held chargeable.

"I think," said Pollock, C. B., "that as matter of fact, if a person gives an order to a tradesman to do some work, he means him to do it in the ordinary and tradesmanlike way, and the employer has a right to presume that he will do it in that way; and if he is guilty of no negligence in the selection of a contractor, he cannot be held chargeable because he did not personally see to it that the work was so done. In this case, too, the position was taken and ably argued by the plaintiff's counsel, that inasmuch as injury might result from a careless execution of the work, the defendant was personally bound to see to it that such precautions were taken as to prevent it; but the court repudiated the doctrine, and held expressly that this duty was only imposed where the injury was consequent upon doing the work in the ordinary mode; and such is the rule established by the decisions both in England and in this country.

Thus stand the two English cases. They cannot be reconciled upon principle. They were decided by the same judge. In the one case he says it was the duty of the railway company to see *how* the contractor was about to construct the bridge; that it was the duty of the company to ascertain what

he was about to do, what materials he would use, and to have seen that the specifications and materials were such as would *insure the construction of a proper and efficient bridge;* though the judgment was put upon an entirely different ground. In the other case he expressly held and based his judgment upon the ground that the work, having been let to a contractor, selected with due care, the employer had a right to presume that the work would be done in the ordinary and tradesman-like way; that he was not bound personally to enquire and see to it *how* the contractor intended to do or was in fact doing the work.

The language used by Pollock, C. B., in *Hole* v. *S. & S. Ry. Co.*, involves a manifest absurdity. Railroad companies, for reasons of sound public policy, are treated as persons—artificial persons—and except to the extent that they are inhibited by their charters, or the general law, they may contract and be contracted with, sue and be sued, and in general conduct their affairs just as natural persons do. Their corporate affairs must, in the nature of things, be entrusted to human agencies, and their roads and necessary structures can only be built and repaired by the same instrumentalities. If, according to the doctrine held by Pollock, C. B., in *Hole* v. *Sittingbourne and Sherness Ry. Co.*, such a company, after exercising due care in selecting a competent and skillful contractor, commits the work to him, must see to it in person that the work, in all its details, is so done as to *insure* safety, it is at once obvious that a duty is imposed which cannot possibly be performed. The personal superintendence of the board of directors and all the stockholders combined could but confuse matters and lead to multiplied mischiefs, because, if not utterly incompetent, they could never agree among themselves what should be done nor how.

Must a railroad company have at every point along its line of road, where its important structures are being erected or repaired, not only a competent and skillful, but an infallible

engineer to superintend its independent contractors, and direct and control them in all the details of their work? If so, then there is an end to all independent employment, for no sane man would subject himself to the risks which such an arrangement would impose, as he could make no safe calculation upon completing with satisfaction to his employer, or with profit to himself, a work the details of which are subject to the direction and control of another. In other words, the important and well recognized distinction between the relation of contractor and contractee and that of master and servant would cease to exist, and every contractor, no matter how skillful and competent he may be, would become the mere servant of his employer. Such, in effect, is what was said by Pollock, C. B., in *Hole* v. *Ry. Co., supra,* and is practically what is contended for in the present case. No such view can be upheld upon either principle or authority. It can but be obvious to every impartial mind that when any person, natural or artificial, and especially the latter, has, in the exercise of due care and caution, selected a competent and skillful contractor, and has committed the work to be done to him, at a stipulated price, and to be done in the approved workmanlike way, and the work be lawful and such as can be accomplished without injury to third persons, if done in the usual workmanlike way, then the utmost degree of care and caution has been exercised that can in reason and justice be required of any employer. This view, of course, is confined to cases like the present, and has no application to cases of injury to passengers, or to employees of a railroad company, resulting from the negligence of such company; for, as will presently be more fully shown, in the present case the relation of master and servant did not exist between the railroad company and the plaintiff's intestate, nor was he a passenger on the company's road; so that no claim to a recovery can be based upon the principles applicable to either of those relations.

Now let us compare the two American cases, *Scammon* v. *City of Chicago* and *City of Chicago* v. *Robbins*, above referred to.

In the first-named case the supreme court of Illinois held, reversing the court below, that an owner of land who contracts with a skillful party to erect a building thereon, and who for that purpose surrenders the premises for the uses of the contractor, is not, during the erection of the building, answerable in damages for an accident which occurs to a stranger passing by; that if the sufferer has any recourse, it is against the contractor, or the corporation within which the property is situated; that the parties who may be accused of negligence under such circumstances are not the servants of the owner of the premises, but of the contractor.

In the other case (*Chicago City* v. *Robbins*), the supreme court of the United States, reversing the Federal district court, overruled, in part, the doctrine held by the supreme court of Illinois in the first-named case of *Scammon et als.* v. *The City of Chicago*. The extent to which the doctrine so held was disapproved by the supreme court of the United States appears in the opinion of Mr. Justice Davis, where he says, after adverting to the fact that the defendant's counsel had cited and relied on *Hilliard* v. *Richardson*, 3 Gray, 349, and *Scammon et als.* v. *The City of Chicago*, 25 Ill., 424, that "*Hilliard* v. *Richardson* was a most elaborate and able discussion of the *respondeat superior*, and the authorities in this country and England were fully reviewed, and we see no reason to question the conclusion at which the court arrived. But that case and the one at bar were not at all alike. That was a case where the owner of a building contracted with a carpenter at an agreed sum to repair it, and a teamster, who was employed by the carpenter to haul boards, left them in the street in front of the lot, and an accident happened. The teamster, when he placed the boards in the street, was engaged in a work collateral to that which the owner contracted for—the repair of the building—and in no sense can the injury be said to happen

from the doing of that defectively which the owner directed
to be done. The owner was correctly held not liable, and one
of the grounds on which the court placed their decision was,
that it was *not a nuisance* erected by the owner of the land, or
by his license, to the injury of another."

Such is the comment of Mr. Justice Davis on the case of
*Hilliard* v. *Richardson*, in which he obviously falls far short of
recognizing the real scope of the decision or the principles
upon which that decision rests. He admits it to be a most
elaborate and able discussion of the *respondeat superior*, in
which the authorities in this country and England were care-
fully reviewed, and that he saw no reason to question the con-
clusion arrived at in that case. But, he says, that case and
the one he had in hand (*Chicago* v. *Robbins*) were not at all
alike. Viewed in the light of reason and principle, this is a
somewhat remarkable distinction—a distinction without a
difference. In both cases the owner let the work to indepen-
dent contractors; in both the mischief resulted from the care-
lessness of the servants of the contractors. In other words,
in *Hilliard* v. *Richardson* the contractor, who had undertaken,
at an agreed price, to repair the house of the contractee, em-
ployed a teamster to haul boards, and the teamster, who was
the servant of the contractor, and not of the owner, left the
boards in the street in front of the house, by reason whereof
the mischief occurred. In *Chicago* v. *Robbins*, the case Mr.
Justice Davis was considering, the contractor made, at an
agreed price, an excavation or pit in the sidewalk of a public
street for area lights, and his servants left the pit insecurely
covered, and the mischief complained of was the result. Now,
upon principle, what conceivable difference is there in the two
cases? None that we can perceive; for, if negligence there
was, it was, in each case, the negligence not of the owner or
proprietor, but of the servant of the contractor, for which the
contractor and not the owner of the property was liable. But,
says Mr. Justice Davis, the teamster, when he placed the

boards in the street, was engaged in a work collateral to that which the owner contracted for—the repair of the building— and that, in no sense, could the injury be said to result from doing defectively that which the owner directed to be done, and that the owner was correctly held not liable. This reasoning is plainly fallacious. If the leaving the boards in the street was a work collateral to that which the owner let to the contractor, by reason whereof the owner was exempt from liability, the same was essentially true of the act of the servants of the contractor, in the case Mr. Justice Davis was deciding, in leaving the pit, dug in the street for area lights, uncovered and unguarded. In each case a dangerous obstruction was placed in a public street, and in each the result was injury to a third person. The obstructions thus created could be said to differ only in degree. But what possible difference could it make to a man whether an injury received by him was the result of leaving a pile of boards or other material in a public street, or was the result of leaving a hole or pit therein for area lights, uncovered and unguarded? If, on principle, there is any difference, we fail to perceive it. It is therefore manifest that, as in each case the mischief resulted from the act of the servants of the contractor, it necessarily follows that in each the owner or proprietor should have been held not liable, as it was not pretended that the work let to contract in either case was unlawful. And Mr. Justice Davis, in commenting on the case of *Scammon* v. *The City of Chicago*, says: "*Scammon* v. *The City of Chicago* is similar in many of its facts to the case he had under consideration, *The City of Chicago* v. *Robbins*, and is decided differently." And adverting to the decision of the supreme court of Illinois in that case, he says: "That court held, as we do, that if the 'nuisance necessarily occurs in the ordinary mode of doing the work, the occupant or owner is liable; but if it is from the negligence of the contractor or his servants, then he should alone be responsible.' But the court also held that 'the omission to

cover the opening in the area did not necessarily occur as an incident to the prosecution of the work,' a rule to which we cannot assent, and which we think is opposed to reason and authority."

Thus, in plain and unequivocal terms, Mr. Justice Davis states his only ground of dissent from the decision in *Scammon* v. *The City of Chicago.* It is only that the Illinois court held, that "the omission to cover the opening in the area did not necessarily occur as an incident to the prosecution of the work," and this, and this only, was the ground of dissent. The ruling dissented from is in exact accord with the numerous cases hereinbefore referred to and relied upon, and is sound upon principle, as well as sustained by ample authority. Upon what conceivable principle, we ask, can it be said that the negligence of a servant of an independent contractor in the prosecution of a work which, in itself, is lawful, is a *necessary incident* to such work? To hold any such doctrine would be, in effect, to hold, as was the case in *Hole* v. *S. & S. Ry. Co.*, *supra*, that to let work to a competent and skillful contractor is, in effect, tantamount to an assumption, on the part of the employer or owner, of responsibility for all injuries resulting from the carelessness of the contractor, his agents or servants. In other words, it would be to hold that in letting to contract a lawful work, the contractee, owner or proprietor becomes necessarily responsible for every unlawful or careless act done by the contractor or his servants in the prosecution of such work. To uphold any such doctrine would be unjust and oppressive, and opposed to both principle and authority.

We have thus compared the two English cases—*Hole* v. *S. & S. Ry. Co.*, and *Britter* v. *Hunter.* Upon both principle and authority, we feel constrained to reject the doctrine laid down in the former, and to approve that in the latter case. So, as to the two American cases—*Scammon* v. *The City of Chicago*, and *City of Chicago* v. *Robbins*—we can but approve the decision in the former, as resting well on principle and authority, while

we reject the latter as opposed to both. We may safely venture the remark, that a careful examination of all the authorities, American and English, will show that all the decisions which, like *Hole* v. *S. & S. Ry. Co.*, and *City of Chicago* v. *Robbins*, are opposed to the conclusion arrived at in the present case, have an obvious leaning towards the unjust and oppressive doctrine held in the old English case of *Bush* v. *Steinman*, *supra*, which was long ago repudiated in both England and this country.

But in the present case, the plaintiff relies with confidence on the case of *The City of Chicago* v. *Robbins*, *supra*. That case, however, can have no application to the case in hand, as, in addition to what has already been said, the judgment therein was distinctly placed upon the ground that the work, which was left unguarded, became a *nuisance*. In the course of his opinion in that case, Mr. Justice Davis said : " This area when it was begun was a lawful work, and if properly cared for, it would always have been lawful ; but it was suffered to remain uncovered, and thereby it became a nuisance, and the owner of the lot for whose benefit it was made, is responsible." This is just the principle upon which the judgment proceeded in *Bush* v. *Steinman*. But however this may be, the language of the judge, above quoted, shows that the judgment was put upon the ground that work, which was lawful in its inception, became a nuisance, and that upon that ground the owner of the property was held liable. It is not pretended in the present case, that the work in question was unlawful, or that, from any cause, it became at any time a nuisance; so that the case of *The City of Chicago* v. *Robbins* can have no application whatever. As was said by Baron Rolfe, in *Hobbit* v. *Ry. Co.*, *supra*, the wrongful act here could not in any possible sense be treated as a nuisance. It was one single act of negligence, and that was the inopportune, careless act of Englesby, the agent or servant of Smith, the contractor, in ordering the signal to be given for the train to pass over

the bridge when it was unsafe; when, had he waited, it may have been a very short time, all would have been well; but he did not wait; and his grossly negligent act was the sole cause of the disaster which followed; and for that negligent and careless act, which resulted so fatally to the plaintiff's intestate, Smith, the contractor, is responsible, and not the railroad company; for, as between the said contractor and Englesby, his foreman, who was the real author of the mischief, the relation of principal and agent or master and servant did exist, and upon the principle *qui facit per alium facit per se*, Smith, the master, is alone responsible. As between Smith, the contractor, and the plaintiff's intestate, Bibb, the relation of master and servant also existed. Bibb was employed and paid by Smith, and bound to receive and obey his orders; he owed no special duty to the railroad company, nor did the latter owe any such duty to him; the company never by contract, express or implied, undertook to look after and protect him against injury, nor had he any right to look to it for the performance of any such duty. He, the plaintiff's intestate, stood in the shoes of his master, who was Smith, the contractor, and was entitled, at the hands of the company, to no other or higher duty than was due from it to Smith. There is no evidence, nor is it pretended, that the railroad company was guilty of negligence or carelessness in the manner of running its train on the bridge, after the signal was given to cross. On the contrary, it is a fact certified, that the train was moving at the rate of three or four miles per hour—a rate of speed not exceeding that of an ordinary pedestrian on a common country road.

In the light of the facts certified, and the principles of law applicable thereto, it is obvious that the rule *respondeat superior* has no application in the present case. The relation of master and servant did not exist between the railroad company and Smith, the contractor, by the negligent or wrongful act of whose agent or servant the injury was occasioned. It is,

therefore, obvious that in no possible sense can it be said that the railroad company stood in the relation of master to either Smith, the contractor, or to his foreman, Englesby. The facts of this case incontestably show that Smith was an independent contractor in the broadest sense of the term. He was, moreover, an engineer in good standing; that he followed an independent calling, had had extensive experience in the construction and erection of iron bridges, and was a professional and practical bridge builder of repute, and had recently erected several very important bridges for the defendant company; that he contracted to build the bridge in question according to plans and specifications previously agreed on; that in its construction he selected, employed and paid his own workmen, who were subject to his orders only, and he was to receive a fixed price for the work complete; and that, while the company's chief engineer and his assistants had the right to criticise both the methods and the workmanship, they did not have the right to direct the methods to be employed by the contractor in the erection of the bridge. There is, therefore, no possible sense in which it could be said that the relation of master and servant existed between the railroad company and the contractor, or between it and Englesby, the agent or servant of the contractor; and in the absence of such relation, there can be no liability on the company.

Yet it is strenuously contended on behalf of the plaintiff in error that Smith was not an independent contractor, but simply an agent or servant of the railroad company, and that the latter is responsible for the negligent and wrongful acts of Smith, his agents or servants, in the prosecution of the work, it being claimed that it was the duty of the company to protect the plaintiff's intestate against the consequences of the negligent and wrongful acts of Smith, or his agents or servants, by refusing to run its trains upon the bridge when it was in an incomplete and dangerous condition, although the signal for the train to pass over the bridge was given in obe-

dience to the order of Englesby, Smith's foreman, and in accordance with the right reserved to Smith in the contract that such signals should be given by Englesby's orders.

This broad proposition embraces all others, of minor importance, asserted by the plaintiff in error, and is directly in conflict with the conclusion at which we have arrived, and with the numerous authorities, American and English, cited in support of that conclusion. The contention is attempted to be upheld by assuming that the maxim, *qui facit per alium facit per se*, and the consequential rule of *respondeat superior*, apply to the facts of this case. The rule of *respondeat superior* is simple and easily understood, though the decided cases show much diversity of opinion in its application, which, it seems, might to a great extent have been avoided. Doubtless, however, this diversity is not traceable to any intricacy or uncertainty in the rule itself, or to any doubt of its correctness, but is due to the great variety and intricacy of the facts in respect to which its application has been invoked, and the yet greater difficulty in determining, in many cases, whether or not the relation existed to which the rule is applicable. Hence, in *Milligan* v. *Wedge, supra*, the remark of Williams, J., that "the difficulty always is to say whose servant the person is that does the injury; when you decide that, the question is solved."

In applying the rule of *respondeat superior*, it is of the utmost importance that it be not extended beyond the reason upon which it is founded. By the plain import of its terms the rule belongs to the relation of superior and subordinate, and is applicable to that relation wherever it exists, whether between principal and agent or master and servant, and where that relation does not exist, there can be no ground for the application of the rule. In the present case, it has been shown beyond question that the person who occasioned the injury was the agent or servant of the contractor, and not of

the railroad company, and that the latter cannot in reason or justice be held liable.

The proposition that, in the present case, Smith was not an independent contractor, but simply the agent or servant of the company, rests on several grounds of contention. Let us now briefly examine them.

I. It is contended that the right reserved by the railroad company to run its trains over the bridge during its construction destroyed the independency of the contractor's employment. Under the circumstances of this and like cases, this proposition is without the sanction of either reason or authority, and must be rejected as opposed not only to reason and justice, but to sound legal principles, almost, if not quite, universally recognized. The obvious vice that lies at the very root of the contention is, that it ignores the indisputable fact that Smith was an independent contractor, employed and paid his own workmen, who were subject to his orders only, and that he stipulated for and was to receive a fixed price for the work complete; ignores the plain and universally recognized distinction between the relation of contractor and contractee and that of principal and agent, or master and servant, and rests solely upon the moral assumption that the reservation by the owner or proprietor of any use or enjoyment whatever of the property on which the work let to contract is to be done necessarily destroys the independency of the contractor's employment. In other words, that a railroad company or private individual cannot, in the one case, build its road or other structures, or repair either, and in the other, the owner of property cannot build a house thereon, or repair one, by the intervention of an independent contractor, without the entire surrender of the possession and use of the property to such contractor; and that, if such surrender be not made, then the employer is liable for any injury to another resulting from the negligent or tortuous act of any agent or servant of the contractor. The recognition of any such principle would not

only lead to the most absurd results, but would be to foster gross injustice and oppression. The fallacy of the proposition is well illustrated by an incident that occurred during the argument of the case of *Readie* v. *The London, &c., Ry. Co.*, *supra*, when Platt, B., put to counsel the following question : "Suppose the occupier of a house were to direct a bricklayer to make certain repairs to it, and one of his workmen, through his carelessness, were to let a brick fall upon a passer-by, is the owner liable?" This was a very pertinent question, and the decision of that case answered it in the negative.

In every such case the question is, not whether the owner or proprietor retained any use of the property during the erection of the work, but who had the *efficient control* of the work contracted to be done. Such control, in cases like the present, is necessarily with the contractor; and, were it otherwise, independent employment would be degraded, its reliability in a great measure destroyed, and the general efficiency of railroad service correspondingly impaired. Hence the books teem with decided cases in which defendants were held not liable for torts committed on their premises by contractors, or their agents or servants, although there had not been an entire surrender of the possession of the premises to the contractor. Such was the case in *DeForest* v. *Wright*, 2 Mich., 368, where a grocer hired a drayman to haul salt to his store; in *Forsyth* v. *Hooper*, 11 Allen (Mass.), 419, where a bell founder employed a person to hoist some bells into a church. See also *Harrison* v. *Collins*, 86 Pa., 153, and *McCarthy* v. *Second Parish of Portland*, 71 Maine, 318.

In point of fact, the proposition contended for rests, in effect, upon the unwarranted assumption that the contractor's foreman, Englesby, whose negligent act caused the injury, had, at one and the same time, two masters—the railroad company, and Smith, the contractor.

The propositions that the rule of *respondeat superior* is appli-

cable only to the immediate superior of the person who does the injury, and that there can ·be but one such responsible superior, were clearly recognized in the leading cases of *Readie* v. *Ry. Co.*, and *Blake* v. *Ferris, supra.*

In *Laugher* v. *Pointer, supra,* Tittledale, J., puts his opinion, that the owner of the carriage was not liable for the injury to a third person, by the negligent driving of the servant of the stable-keeper, expressly on the ground that the driver could not be the servant of both the livery stable-keeper and the person riding in the carriage; and he added, that he " was the servant of one *or* the other, but not the servant of one *and* the other; that the law did not recognize a several liability in ·two principles."

II. It is contended, that the defendant company, in its contract with Smith, reserved a degree of control over the work to be erected, which is inconsistent with the idea that Smith was an independent ·contractor. This contention cannot prevail. In Thompson on Negligence, p. 913, it is said: " The mere fact that the proprietor retains a general supervision over the work, for the purpose of satisfying himself that the contractor carries out the stipulations of his contract, does not make him responsible for wrongs done to third persons in the prosecution of the work—as where a railway company employs an engineer to superintend the progress of the construction of its road and to see that the work is done according to contract." The author then cites, *per contra*, the case of *Schwartz* v. *Gilmore*, 45 Ill., 455, and adds: " This, however, is not the sound view of the usual building contract. The contractor stipulates to deliver to the proprietor certain results. He is responsible to the proprietor for these only. The proprietor does not retain control over the contractor as to his methods of proceeding with the work. He could not do so; for the contractor is generally skilled in the business and he is not. No contractor could safely stipulate to do a job at a fixed

price, and then allow the proprietor to control him in matters of method and detail; for this might destroy his power so to order the work as to make his contract a profitable one."

"Accordingly it has been held that a contract between a municipal corporation and a contractor for the construction of a sewer, containing the provision, 'all work to be commenced and carried on, at such times and such places and in such manner as the engineer shall direct,' and requiring the contractor to dismiss from his employment all incompetent and unfaithful persons, did not reduce the contractor to the grade of a servant of the city and make it answerable for his negligence." See *Erie* v. *Caulkins*, 85 Pa. St., 247; *Hurst* v. *Penn. R. R. Co.*, 51 Pa., St., 475; Shuman and Redfield on Negligence, § § 78–81. See also *Park* v. *Mayor of New York*, 8 N. Y., 227, and *Kelly* v. *Mayor of New York*, 11 N. Y., 432, which strongly sustain the same view. These views are sustained by a great number of well-considered cases, only a few of which, in addition to those already referred to, need be cited. See *Readie* v. *Ry. Co. supra; Berry* v. *St. Louis*, 17 Mo., 121; *Callahan* v. *R. R. Co.*, 23 Iowa, 532; *Allen* v. *Willard*, 57 Pa., 374; *Cuff* v. *N. & N. Y. R. R. Co.*, 35 N. J., 17; *Eaton* v. *E. & N. A. Ry. Co.*, 59 Maine, 520; *Tibbetts* v. *Knox and L. R. R.*, 62 Maine, 437; *Samuelson* v. *Cleveland I. M. Co.*, 49 Mich., 164.

The last named case is a complete refutation of the claim in the present case, that the right of inspection carried with it the duty of rejecting all improper workmanship. In that case, the defendant, the owner of an iron mine, contracted with certain persons to work it, but stipulated that the contractors and not the owner should be responsible for any injuries to workmen, and the responsibility was assumed by the contractors. The mine was in proper condition when the contractors took possession; but the contract contained a stipulation, that when the contractors repaired the mine it should be done under the supervision, advice and control of the defendant's superintendent.

In delivering the opinion of the court, and commenting on this provision, Judge Cooley, among other things, said : " But the supervision does not make the owner principal in the mine, or master in the working of it.   The owner assumes towards no one the duty to supervise ; he does not stipulate to supervise; he only contracts for a privilege.  If the mine owner in this case had dismissed the superintendent and sent no one to inspect the working, no miner could complain that a duty owing to him was being neglected.   The company had not promised to protect him, or to indemnify him for injuries; on the contrary, it had expressly stipulated that it would assume no such responsibility.   The privilege of intervention for its own protection was reserved ; but the neglect of one's own interest is no wrong to others   Legal wrongs must spring from neglect of legal duties ;" citing as in print *Readie* v. *Ry. Co.*, 4 Exch., 244, before referred to.

This view of Judge Cooley is peculiarly appropriate to the case in hand—so much so that comment is unnecessary.  The injury in that case was to an employee of the contractors, and the same is true in the present case.  But in this case, it is a singular fact, that while it is assumed that Englesby, whose negligent and careless act caused the injury, was the servant of the railroad company, yet every authority relied upon presents the case of an injury to a *third person ;* not a single case is cited by the plaintiff in which the injury was to an employee of the contractor.  Obviously, if, as insisted, the railroad company owed to the plaintiff's intestate the duty of protecting him against injury, it could be on no other ground than that the relation of master and servant existed between them; but it is perfectly clear that no such relation existed. It is equally clear that as the servant of Smith, the plaintiff's intestate did stand in the relation of servant to him, and as the second person in the contract for services to be rendered by him.  It is clear, therefore, that the plaintiff's intestate was not a *third person,* or stranger, either in respect to the rail-

road company or Smith, the contractor, but was simply one of two persons to the contract for service between the contractor and himself. Hence the authorities respecting injuries to *third persons* can have no application to his case. There was no contract relation, express or implied, between the railroad company and the employees of the contractor, or either of them; and as between said company and the plaintiff's intestate there was no relation whatever, other than that which springs from the common bond of society, as expressed in the maxim *sec uteri tuo ut alienum non laedas,* which imposes upon every man the duty of so using his own as to do no injury to his fellow man. It can in no just sense be said that the railroad company violated this rule; for it is not pretended even that the injury was the result of the careless *manner* in which the company ran its train on the bridge. On the contrary, it is certified that the company exercised due care in the selection of the material furnished, and that it was sufficient for the purposes for which it was intended; that the bridge gave way and fell because the sway braces, lateral braces, and struts had not been put in position. And it clearly appears that the mischief was the result of the wrongful act of Englesby, the contractor's agent or servant, in ordering the signal for the train to pass, in the then insecure condition of the bridge.

III. And it is also contended that there was an obligation imposed by law upon the railroad company to see that its track was safe, and that it cannot shift this obligation upon an independent contractor.

If the plaintiff's intestate had been either a passenger on the ill-fated train, or an employee of the company, then this insistence would have some show of reason; but he was neither, and he cannot avail himself of the principles applicable in either class of cases.

IV. But, among other things, it is certified that to run a train of coal cars upon such a bridge, in such a condition, would be foolhardy; and this is fastened upon as a conclusive

reason for holding the railroad company liable, and upon the express ground that the defective and unsafe condition of the bridge was open and obvious, and could or ought to have been seen by the company's assistant engineer, Major Goodwin, who was on the ground at the time, or just before the accident, and only three minutes before had left the bridge, passed to the rear of the train, and was in the act of mounting on to the caboose to return to Lynchburg, when he heard the crash and desisted. Is it credible that he would thus have imperilled his life by attempting to ride over the bridge in the caboose attached to the very train under which the bridge fell if the danger was open to common observation? We think not.

The question whether the span which fell was, in any particular stage of its progress, safe, was, in the nature of things, one to be determined by Smith or his foreman, Englesby, by whom he acted. This is well illustrated by the correspondence between the parties, leading up to the contract in question. In a letter written by Smith to Chief Engineer Coe, dated Baltimore, December 9th, 1886, he says: "Replying to yours of the 1st inst., I write that, during my late absence at St. Louis, &c., my best draughtsman worked out the drawings for the removal of Big Otter bridge, and when I came to checking them up, within a few days, I found that the premises assumed were a little out, and a new study is required. This will probably delay matters a few days," &c. Now, was it competent for the assistant engineer, Major Goodwin, to interfere and delay the work until he could *study* the situation upon some theory of his own? Certainly not; for, in the first place, he had no such right under the terms of the contract; and, in the second place, any such interference could only have produced confusion and delay, and would have tended to involve his company in liability not contemplated by the contracting parties. It is clear that the danger was not open to common observation, and that the plaintiff's case has no sup-

port in the fact that it was foolhardy to run the train on the bridge in its insecure condition. The contractor, acting by his foreman, knew, or ought to have known, the condition of the bridge. He reserved, for his protection, the right to have the signals for the passage of trains given when his foreman, Englesby, so ordered. The signal was given in obedience to Englesby's order. The bridge was then unsafe, hence the disaster that followed, and for it the contractor, Smith, is alone liable.

This case has been argued for the plaintiff very much as if the plaintiff's intestate was a common day laborer, and in the simplicity of his nature trusted to the railroad company for protection. The facts certified warrant no such conclusion, but quite the contrary.

In a telegram to Chief Engineer Coe, dated Baltimore, January 13th, 1887, Smith says: "Foreman reports James river bridge finished, and he awaiting orders with his gang at Lynchburg. Shall I order them up to Otter or Ivy Creek at once?" On the next day he says to Engineer Coe: "I will send Englesby and gang to Harrisonburg if you decide to postpone the trestling as suggested." On another occasion he spoke of them as "my erectors." Now, considering the character of work in which Smith was engaged in connection with the terms used in respect to his workmen, such as "Englesby and his gang" and "my erectors," the reasonable inference is that the plaintiff's intestate was one of the gang—one of the erectors—and that they were all trained hands in the art of bridge erection.

It may be stated in general that companies constructing railroads and cities constructing public works in the performance of corporate duties, have again and again been held exempt from liability for the negligence of contractors and subcontractors, or their agents or servants. In addition to the authorities already referred to in support of this proposition only a few more need be cited. See *King* v. *R. R. Co.*, 66 N.

Y., 182; *Gosham* v. *Gross*, 125 Mass., 232; *Cunningham* v. *R. R. Co.*, 51 Texas, 503; *Painter* v. *Mayor of Pittsburg*, 46 Pa., 221; *Steel* v. *S. E. R. R. Co.*, 16 C. B., 550; *Clark* v. *Vt. & Con. R. R.*, 28 Verm., 103; *Paulett* v. *R. & W. R. R. Co.*, 28 Verm., 297; *Callahan* v. *B. & M. R. R. Co.*, 23 Iowa, 562; *Cuff* v. *N. & N. Y. R. R. Co.*, 59 Maine, 520; *West* v. *St. L. & V. R. R Co.*, 63 Ill., 545; *Tibbitts* v. *K & L. R. R. Co.*, 62 Mo., 437; *McCafferty* v. *The Spuyten Duyvil and Port Morris Railroad Company*, 61 N. Y., 178.

In the last-named case it was held:

1st. That a railroad company which had let by contract the entire work of constructing its road, and had no control over those employed in the work, was not liable for injuries to a third person, occasioned by the negligent acts of those employed in doing the work, such as blasting in a manner to throw rocks upon the lands of another.

2d. That a party is not chargeable with the negligent acts of another in doing work upon his lands, unless he stands in the character of employer to the one guilty of the negligence, or unless the work as authorized by him would necessarily produce the injuries complained of, or they are occasioned by the omission of some duty incumbent upon him.

3d. That there is no distinction in this respect between an owner of real and of personal property, and the former is held to no stricter liability for the negligent use and management of his real estate, or of negligent acts upon it by others, than is the latter as to a similar use of his property.

Such is the true doctrine, and we adopt it as the only doctrine justly applicable to the present and all similar cases. There is, therefore, no just ground upon which the plaintiff in error, the plaintiff below, can base a right of recovery in the present case. We are of opinion that there is no error in the judgment of the court below. As all other questions raised are dependent upon that raised by the plaintiff's first and most material bill of exceptions, which has been very fully

considered, and as the determination thereof on the facts and law of the case, will probably operate as a final disposition of the case itself, we deem it unnecessary to consider the questions raised by other exceptions of minor importance. The judgment of the court below is correct, and must be affirmed.

JUDGMENT AFFIRMED.