## Richmond

HATTIE L. BUTLER, AS ADM'X, ETC. V. JAMES DARDEN AND SEABOARD AIR LINE RAILWAY COMPANY.

April 25, 1949.

Record No. 3486.

Present, All the Justices.

460

The opinion states the case.

*Thomas L. Woodward* and *Paul L. Everett*, for the plaintiff in error.

*A. E. S. Stephens, Rodham T. Delk, Charles B. Godwin, Jr.,* and *Mills E. Godwin, Jr.,* for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

Ralph Butler was killed when the front end of the automobile in which he was riding as a guest was struck by a Seaboard Air Line train at a grade crossing in the village of Carrsville, Isle of Wight county. James Darden

was the driver of the car. Butler's administratrix brought this suit against Darden and the railway company. A jury returned this verdict:

"We, the jury find the defendants James Darden and Seaboard Railroad with negligence with the amount of $2,500.00 from each defendant payable to Mrs. Hattie L. Butler."

On motion of both defendants the court set aside this verdict and entered judgment for the defendants. That action of the court is now assigned as error.

The accident happened on Sunday afternoon, May 19, 1946, about 4:22 o'clock. The weather was clear. At the place of accident the railroad runs east and west. Darden was crossing from south to north. The train that struck his car was going west. The highway over the crossing, State Highway No. 651, runs east along the south side of the railroad and practically parallel with it until it gets to a point 175 feet south of the crossing, where it makes almost a right angle turn to the left, or north, to go across the tracks. There are two tracks on the crossing—the main line, which is in the middle of the right of way, and a passing track eight feet nine and one-half inches south of the main line.

Darden, with Butler at his right on the front seat, drove along this road going east. As he turned to his left at the curve, or corner, vision to his right was obstructed by brush and weeds until he reached the corner of a fence called the Wade fence, which runs east from there parallel with the railroad right of way. This corner is ten feet south of the right of way, which is 100 feet wide, and 60 feet south of the main line. From that point there is virtually a clear view to the east, from which direction the train was approaching. This was a passenger train, consisting of a Diesel engine and nine cars, running on the main line track. Darden drove on toward the crossing at about ten miles an hour, and neither he nor Butler saw the train until the front of the automobile was on the passing track. At that time Butler cried out, "Look out, there comes a train." Before the automobile was stopped it proceeded so

close to the main line that the overhang of the engine struck the car about the right front wheel, throwing it around toward the passing track and killing Butler. Darden was thrown out of the car but was not seriously injured.

The tracks were level and straight east and west of the crossing and there were no cars on the passing track. The road as it approached the right of way was about three feet lower than the crossing, and the track level was reached over a short rise, at the bottom of which was a culvert. The roadway over the crossing was only 13 feet wide and its surface was bumpy, with the rails extending a little above the surface. Darden said it was about all a car could do to make it in high gear.

Photographs were introduced, some taken a day or two after the accident and others in July, 1947, showing the crossing, the approaching highway, the tracks and area adjacent to them as far east as an overhead bridge 1395 feet from the crossing. South of the right of way were a couple of buildings fronting about on a line with the Wade fence. There was a roadway on the right of way about half way between the Wade fence and the passing track. Between that roadway and the passing track were some telephone poles. There was a small telephone booth some 400 feet east of the crossing a little nearer the passing track than the poles.

Three hundred thirty feet west of the overhead bridge referred to is a crossing called the main crossing. Eight hundred sixty-five feet west of this main crossing is another called the Wade crossing, and 200 feet west of the Wade crossing is the Duke crossing, where the accident happened.

The plaintiff made no effort to prove the speed of the train. Darden testified it was running around 60 miles an hour but said "things looked worse than they would be," and admitted this was a pure guess. It was not sufficient to contradict the evidence of the train crew that the train was on schedule and was running at not more than 30 miles an hour.

To sustain a recovery against Darden the plaintiff must prove that he was guilty of gross negligence, since her intestate was a guest passenger in Darden's car. If she failed in that or if Butler was himself guilty of negligence that contributed to the accident, the action of the court in setting aside the verdict against Darden was proper.

The plaintiff's evidence established that there was nothing to prevent Darden from seeing the approaching train after he passed the corner of the Wade fence, which was 45 feet from the passing track. The engineer who made the plaintiff's map so testified, as did her witness, Duke, who lived close to the crossing and passed over it, he said, three or four times every day. He testified that from the Wade fence to the tracks the view to the east was not obstructed and that a person approaching the crossing in an automobile could see three-fourths of a mile up the track to the east, even under the overhead bridge and beyond. The photographs show this to be true, certainly as far as the bridge 1395 feet east of the crossing.

Darden's effort was to show that because of grass and weeds on the right of way, the telephone poles and booth, he was excusable in not seeing the train sooner than he did. Plaintiff's witness, March, also testified that because of the conditions one must be within 20 feet of the passing track to see the bridge, and from 15 to 18 feet of that track to see a Diesel engine 150 to 200 yards away. Darden testified that when he got to the roadway on the right of way, he looked to his right "and I didn't see any smoke of a train and I didn't hear the whistle, and I looked back to my left towards Franklin and I made to go across, and at that I looked again; then Mr. Butler said, 'Lookout, there comes the train', and I applied my brakes, reached to put it in reverse, or move it, I don't know, and the next thing I know, I was in the air."

There was evidence that after the accident Darden said he didn't see any smoke and wasn't thinking about the train, and further that his brakes "would not stop, wouldn't hold." But he was on the passing track, within ten feet of the main

line, and within less than that of the overhang of the engine (which was nine feet wide), going ten miles an hour, when he applied his brakes. In that situation it is not surprising that he would also say that "he did not hardly know what he did," as a witness testified.

■■ We cannot say that the verdict of the jury was without evidence of gross negligence to support it. From the evidence the jury could find that Darden, perfectly familiar with conditions at the crossing, drove into the path of the approaching train, without looking or listening, when the train was plainly to be seen.

But if Darden was guilty of gross negligence, then the evidence that convicts him clearly convicts his passenger, Butler, of contributory negligence. If it was gross negligence in Darden to drive upon the railroad tracks without seeing the train, it is difficult to see how the failure of Butler to see it was no negligence at all. He had at least the 45 feet from the Wade fence to the passing track to look and to see it. If Darden was going ten miles an hour and the train 30, the train was less than 150 feet from the crossing when he passed the Wade corner, or less than 300 feet away if the train was going 60 miles an hour, as he guessed.

How then may it be said that if Darden was guilty of gross negligence in not looking, Butler was not guilty of any negligence when he did not look? He was sitting on the side from which the train came. Darden had to give some attention to his driving in order to negotiate the narrow and bumpy crossing. Butler had nothing to do but look. Necessarily he did not look or if he did he gave no warning to Darden until the car was on the passing track.

It was Butler's duty to look and listen and he was in a position in the car where he could have done so more effectively than Darden. The evidence shows that Butler was also perfectly familiar with this crossing—in fact, that is conceded in plaintiff's brief.

While the negligence of the driver is not to be imputed to the passenger, yet the passenger must exercise reasonable

care for his own safety. He must look and listen and warn his driver if he sees a train approaching. The railroad track is to him, as to others, a signal of danger. Since he knew the crossing and its use and the condition of its approaches, more was required of him than of a stranger to the locality. He should have looked and listened where it would have been effective and this duty was commensurate with the character of the crossing as he knew it to be. *Hancock* v. *Norfolk, etc., R. Co.*, 149 Va. 829, 141 S. E. 849; *Norfolk, etc., R. Co.* v. *Wellons*, 155 Va. 218, 154 S. E. 575; *Virginian R. Co.* v. *Rodgers*, 170 Va. 581, 197 S. E. 476; *Southern R. Co.* v. *Whetzel*, 159 Va. 796, 167 S. E. 427; *Virginian R. Co.* v. *Bacon*, 156 Va. 337, 157 S. E. 789.

*Southern R. Co.* v. *Jones*, 118 Va. 685, 689, 88 S. E. 178, 180, was a case in which no warning was given of the approach of the train. The negligence of the railroad company was admitted and the defense rested upon the contributory negligence of the passenger in the vehicle. This statement by Judge Keith in the opinion applies here:

"By the side of the driver sat the plaintiff's intestate. All that was visible to the one was equally so to the other, and there is no proof nor even a suggestion that he, more than the driver, by word or act, took any precaution for his own safety. Upon this record they were both equally guilty of the negligence which caused the accident."

Plaintiff relies on *Mize* v. *Gardner Motor Co.*, 166 Va. 415, 186 S. E. 108, as requiring the conclusion here that the question of contributory negligence was for the jury. As pointed out by Mr. Justice Gregory in that opinion, railroad crossing cases are seldom alike. In that case both the driver and Mize, the passenger, were killed. There was no evidence, as the opinion states, that Mize failed to perform his duty of looking and listening for the train and warning the driver of its approach. "We do not know what he said or did. It was incumbent upon the defendants to prove that he failed in his duty. This they have not done." 166 Va. at p. 422, 186 S. E. at p. 111. That is not this case. Here there is evidence, uncontradicted, that Butler

did not look or listen until the automobile was on the passing track, or if he did, then he gave no warning to the driver until that time, which was the same time as the driver himself looked and saw it.

Some argument is made that Darden's gross negligence consisted only of driving with defective brakes, for which Butler was not responsible. Darden denied that he said his failure to stop when Butler cried out was because his brakes would not hold. He asserted that what he said was that his brakes would not "hold enough by the time I got to the track." He testified specifically that there was nothing wrong with his brakes and that they had been working all right. There was necessarily some reaction time after Butler yelled and Darden saw the train practically upon him. His forward progress could have continued in such an emergency if he had had perfect brakes. Gross negligence ought not to be predicated on his failing to stop in the very short space of time and distance after Butler cried out.

Obviously, we think, plaintiff should not be allowed to recover against Darden.

Plaintiff seeks to hold the railway company on the ground that there was positive evidence it did not give the signals required by the statute. The railway company contends that the evidence so relied on was purely negative.

Code, 1942 (Michie), section 3958, requires that the whistle be sounded at least twice at not less than 300 yards, nor more than 600 yards, from the crossing, and that the bell be rung or the whistle sounded continuously or alternately until the engine has reached the crossing. Section 3959 of the Code provides that if these signals are not given, the negligence of the plaintiff shall not bar recovery for injury or death, but may be considered in mitigation of damages.

"The statement of a witness that he did not hear such a signal is without value as evidence, unless it further appears that he was in a position to hear, was attentive, and that the conditions were such that he would probably have

heard such signal if it had been sounded." *White* v. *Southern R. Co.*, 151 Va. 302, 314-15, 144 S. E. 424, 427. *Southern R. Co.* v. *Berry*, 172 Va. 266, 1 S. E. (2d) 261.

The bell on this engine was automatic, started by a valve turned on in the cab, and it rings continuously until cut off. The engineer testified he turned this bell on before he got to the first crossing—that is, the main crossing—which is 1065 feet, or 355 yards, from the Duke crossing where the accident occurred, and that it was not turned off until the train was completely stopped after the accident. There is no contradiction of this testimony. In fact, Lee Beale, a witness for Darden (whose effort was to establish that the signals were not given), who was standing near the main crossing, testified that the bell was ringing when the train passed over that crossing and that it was ringing after the train stopped. *Cf. Atlantic Coast Line R. Co.* v. *Clements*, 184 Va. 656, 666, 36 S. E. (2d) 553, 558.

Another witness for Darden, who was in a barn four or five hundred yards south of the track, heard the whistle blow, he did not know how many times, up in the direction of the overhead bridge and in less than a minute he heard the noise and saw the dust from the collision.

The engineer of the train testified that he first blew for the Carrsville station, which was a flag stop, then for the main crossing, then as he passed over the main crossing he blew for the Duke crossing, two long, one short and one long. The conductor testified that the crossings were so close together that there was a succession of blows, and the fireman testified that the whistle was blowing. In addition, these distinterested witnesses testified they heard the whistle:

J. E. Rose was at his home, shown in one of the photographs, about 400 yards west of the crossing. He saw the train as it cleared the overhead bridge, heard the crash and saw Darden flung into the air. He noticed the train particularly because the Diesel engine had not been in use very long. He thought he heard the whistle before the

train got to the bridge but he knew it blew after it came under the bridge.

R. C. Harrell was at the Rose place and was standing looking as the train came up the track and he saw the crash. He first saw the train close to the overhead bridge and he heard the whistle blow "several times."

R. L. Miles was at his home about 500 yards south of the bridge. He heard the train come through and it blew several times, "I would say as much as two or three times to my knowing." He noticed it because it was a different whistle from the one on the steam engine they had been using.

Against this positive evidence, the plaintiff relies on the testimony of two witnesses. One of them was Darden, whose testimony was clearly negative. It amounted to no more than saying he did not hear the whistle blow or the bell ring. His failure to see the train establishes that he was not attentive. These were questions and answers on his cross-examination:

"Q. But you are positive that that whistle was never sounded, is that right?

"A. I didn't hear it.

"Q. But you won't say it was not sounded, will you?

"A. If it was sounded, I didn't hear it."

The other witness was Robert Faulk, called by the railway company. He testified he was walking down the street in front of Wright's store, north of the track, with Lee Beale going toward the Duke crossing. When he heard the train coming he looked back and it was then about two or three hundred yards away and looked like it was stopping for the crossing at the overhead bridge. He was asked whether it blew more than once. His reply was, "I only heard it blow once or twice," and then:

"Q. Do you know where it blew the first time?

"A. No.

"Q. Do you know where it blew the second time?

"A. Up at the bridge up there.

"Q. Was it blowing a long blast?

"A. I don't know."

He said that after the train passed he kept on walking with Beale and the next thing he saw or heard the train had hit something. He was then asked whether he had heard Darden make a statement and he said he had not. Counsel for the railway company said he was taken by surprise by the witness' testimony and asked leave to cross-examine him. He was then asked if he had not stated a few days after the accident that he heard the train blow about the overhead bridge and that it blew straight on through Carrsville. His answer was, "I told him it blew on the other side of the overhead bridge and it commenced slowing down." He then stated, "It didn't blow any more after the overhead bridge." On cross-examination by Darden's counsel he said he heard two short blasts "not so far on the other side of the overhead bridge," and then:

"Q. Is that the first you heard of it?

"A. Yes, sir.

"Q. She was at that time out of sight?

"A. No.

"Q. The first time you heard it, was it out of sight the first time you heard it?

"A. Yes, sir.

"Q. About how far was she up there, Robert, up there some distance?

"A. Not so far.

"Q. Three or four hundred yards?

"A. Not quite a half mile.

"Q. And that is when you heard it blow?

"A. That is right.

"Q. It was one of those new-fangled kind of trains, like you had never seen many before, and you wanted to look at it?

"A. Yes, sir.

"Q. She came down there and you looked at it from the time you heard it blow about half mile away until it came on past?

"A. Yes, sir.

"Q. And you didn't hear the bell ring?

"A. No, sir.

"Q. And you didn't hear her blow any more after she blew that first time?

"A. No, I didn't."

The recital of this evidence demonstrates that the testimony of this witness was wholly inadequate to support a verdict as against the positive testimony that the statutory signals were given. He even denied hearing the bell, which his companion heard. There was appreciably less to hang a verdict on here than in the case of *Chesapeake, etc., R. Co. v. Jacobs*, 166 Va. 11, 20, 183 S. E. 221, 225. Of that evidence the present Chief Justice Hudgins said:

"Considering all the evidence for plaintiff, the best that can be said for it is, that there was a scintilla of positive evidence, but not enough to support a finding by the jury, that the requisite crossing signals were not sounded."

The verdict here was set aside by the trial court and is therefore not entitled to the same weight as one that has been approved. *Schools* v. *Walker*, 187 Va. 619, 47 S. E. (2d) 418. It bears evidence within itself of confusion in the minds of the jury in applying the governing principles. It seems to find Darden and the railway company guilty of the same kind of negligence when a higher degree was essential to a recovery against Darden, to say nothing of the question as to the legal effect of the verdict in regard to the amount of damages.

We conclude that the judgment of the trial court was right and it is accordingly

*Affirmed.*