# Staunton

## Ruth H. Wray, Adminstratrix, etc. v. Norfolk & Western Railway Company.

September 6, 1950.

Record No. 3657.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*Bohannan, Bohannan & Kinsey,* for the plaintiff in error.

*J. M. Townsend* and *Morton G. Goode,* for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

Ruth H. Wray, administratrix of the estate of her husband, Rodney Atwell Wray, instituted this action against the Norfolk & Western Railway Company for damages for the wrongful death of decedent, which resulted when the truck he was driving was struck by a Norfolk & Western

passenger train at a grade crossing in the city of Petersburg. From the judgment entered on the verdict for defendant plaintiff obtained this writ of error.

The Norfolk & Western Railway Company, hereinafter designated "defendant," at the crossing in question, maintains three separate tracks on its right of way extending east and west.

The city of Petersburg owns the only tract of land in this vicinity, which is bounded on the south by defendant's right of way and on the north by the Appomattox river. In 1942 the City decided to use this tract of land as a "city dump." At its request defendant constructed a grade crossing over its right of way for the purpose of giving the city ingress and egress to the land which was thereafter used as a "city dump."

For several years prior to the date of the accident Rodney Atwell Wray had been employed as a driver of a garbage truck for Petersburg, during which time he used this crossing daily, except Sundays and holidays. On January 17, 1948, Wray, with two helpers, had driven over the crossing to the dump, unloaded the garbage, and approached the crossing from the north. Claiborne Cook, one of his helpers, was riding in the cab with him. John Bonner, the other helper, was standing in the body of the truck, leaning on the cab. Wray brought his truck to a stop within 45 feet of the nearest rail to him. From this position he had an unobstructed view of the tracks to the east of approximately 1500 feet. At the time, and within this unobstructed view, defendant's passenger train, known as the "Powhatan Arrow," was approaching on the middle track at a speed of 25 miles an hour. Wray, without looking in an easterly direction, or apparently without seeing the train, started his truck and attempted to negotiate the crossing. As he did so, the front of the engine collided with the truck with such force that the truck was carried west some distance. Wray died within an hour as a result of injuries received in the collision. Claiborne Cook was rendered unconscious and

when he regained consciousness, he was unable to remember anything about the accident. Bonner saw the approaching train, knocked on the cab for the purpose of warning the driver of the apparent danger, ran to the rear of the truck and jumped out before the impact, thus escaping injury.

Some evidence was introduced tending to show that the signals required by statute for highway crossings were not given. Several witnesses, including the engineer and fireman in charge of the engine, a telegraph operator in a tower within 100 feet of the crossing, and a clerk of defendant checking cars on the yard, testified positively that crossing signals were given.

The plaintiff's main contention is that the trial court committed reversible error in refusing to submit the question of comparative negligence to the jury. This ruling of the trial court was consistent with its theory of the case: namely, that the doctrine of comparative negligence prescribed by section 56-416 of the 1950 Code was not applicable because the way in question was a private and not a public highway.

On this theory, the negligence of decedent bars plaintiff's right to recover. A traveler upon a highway, who, on approaching a grade crossing, stops his vehicle in a place of safety, apparently for the purpose of looking and listening for trains which may be approaching, and then proceeds upon the tracks at a time when a train in full view is approaching less than 200 feet away, at undiminished speed, is guilty of a reckless disregard of all precautions for his own safety. Among the recent cases in which this principle was applied, see *Atlantic Coast Line R. Co.* v. *Clements,* 184 Va. 656, 36 S. E. (2d) 553; *Norfolk, etc., R. Co.* v. *Epling,* 189 Va. 551, 53 S. E. (2d) 817; and *Butler* v. *Darden,* 189 Va. 459, 53 S. E. (2d) 146.

Section 56-414 of the 1950 Code prescribes the signals to be given by railway trains for grade crossings over a highway *"outside* of incorporated cities and towns," and pro-

vides that such trains "shall give such signals in cities and towns as the legislative authorities thereof may require."

Chapter 25, sec. 2, of the Code of the city of Petersburg, adopted by the Council on April 15, 1941, provides that any locomotive approaching a street crossing shall begin ringing its bell 50 yards from the street and shall continue to ring it until the train passes over the crossing.

Sec. 56-416 of the 1950 Code provides that "If the employees in charge of any railroad engine or train fail to give the signals required by law on approaching *a grade crossing of a public highway*, the fact that a traveler on such highway failed to exercise due care in approaching such crossing shall not bar recovery for an injury to or death of such traveler, nor for an injury to or the destruction of property in his charge, where such injury, death, or destruction results from a collision on such crossing between such engine or train and such traveler or the property in his charge, respectively; but the failure of the traveler to exercise such care, may be considered in mitigation of damages." (Italics added.)

It was held in *Norfolk, etc., R. Co.* v. *White*, 158 Va. 243, 163 S. E. 530, that the signals required by city ordinance to be given by the employees in charge of a railroad train approaching a public street within the city were within the purview of the foregoing statute, and if such signals were not given and a traveler on the street was injured, the negligence of the injured party would not bar a recovery, but such negligence must be considered in mitigation of damages.

■ Whether the doctrine of comparative negligence, as provided by the statute, applies, depends upon whether the crossing in question was a link of a public way. The evidence on this issue may be summarized as follows:

The official map of the city of Petersburg, made in 1943, does not show that any public street extends across defendant's right of way in this section of the city. It does show that Bollingbrook street, formerly known as Poythress street,

extends east and west, approximately parallel with defendant's right of way. It also shows that Irving street terminates at Bollingbrook street and extends south at right angles therefrom, but does not cross Bollingbrook street or defendant's right of way. These facts appear from several other maps of Petersburg filed as exhibits with the record.

Whitworth Cotten, engineer for Petersburg, testified that he was born in the city in 1908, and that he understood that at some former time Irving street extended across the right of way, but he never saw such a crossing and none had existed in his recollection. Several witnesses for defendant testified that there had been no grade crossing over defendant's right of way at Irving street since 1917. They were not familiar with the situation prior to that time.

A report and plot of lots made by R. D. Budd, city engineer in 1910, for the purpose of sale for delinquent taxes, indicate that the northern end of Irving street did extend across defendant's right of way. However, no witness testified that any crossing at this point had been constructed for and used by the public.

In 1921 the officials of Petersburg requested defendant to construct and maintain a grade crossing permitting the city to extend Irving street over its right of way. This request was refused, on the ground that such a crossing at this point would be too hazardous to justify the public use thereof.

Paul Morton, city manager in 1931, wrote defendant and referred to prior correspondence on the subject of "replacing the crossing of the tracks in the vicinity of Irving street," and stated "My information is that, in order to remove the hazard and liability of crossing these tracks, your company offered the use of your gravel pit, near your main line crossing of the Hopewell highway," as a garbage and trash dump. Morton concluded his letter in the following language: "I would appreciate hearing from you promptly whether I am correct in my information and if we may use this gravel pit, otherwise it may be necessary to

require the replacement of the crossing, for the use of Swann's Island."

Defendant granted this request and Petersburg used defendant's sand pit east of Petersburg as a city dump for eleven years thereafter. In 1942 the health authorities of Prince George county notified Petersburg that the continued use of the sand pit for disposal of city garbage and trash constituted a nuisance and requested it to abate the same. Petersburg thereupon invited defendant to send representatives to the site to confer with representatives of Petersburg for the purpose of determining where and when a grade crossing over defendant's right of way might be constructed, which would enable Petersburg to have access to its Swann's Island tract of land for use as a city dump.

There is some conflict in the testimony as to the phraseology and construction of the agreement made by representatives of the parties on this occasion. Defendant refused to construct a crossing as a part of Irving street extended, on the ground that it was too hazardous and that such a crossing would unduly interfere with "frogs" and switches connecting the different tracks on defendant's railway yard. The parties concede that it was agreed, subject to the approval of the city attorney, who was then Mr. J. Gordon Bohannan (1) that a crossing would be constructed approximately 50 feet east of a direct line extending from Irving street across defendant's right of way; (2) that the city would erect gates or bars across the proposed roadway just to the south of defendant's right of way; (3) that the city would keep the gates or bars locked at night and on Sundays and holidays and at other times when the city was not using the road for the purpose of going to and from the proposed dump; (4) that the city would require its truck drivers and helpers to flag the trucks in safety over the crossing when going to and from the dump; and (5) that defendant would instruct its employees in charge of locomotives and trains to give the signals for grade crossings and would erect railroad crossing signs in order to

reduce to a minimum the hazards of those using the grade crossing.

Evidently the attorney for the city approved the stipulations of the representatives of the city and defendant, because immediately thereafter each promise of the respective parties was performed.

Since 1942, Petersburg has maintained bars across its road just to the south of defendant's right of way. Usually these bars were locked at night and on Sundays and holidays. Petersburg kept the keys to the lock, and persons who desired to use the city dump were required to obtain permission from the city, and, when it was necessary, to obtain the keys to the lock on the bars.

Mr. Cotten, city engineer, was asked:

"Q. Do you know whether the drivers of trucks going over there were instructed to stop and flag the crossing to see if any trains were coming?

"A. These instructions were given when the crossing was first installed.

"Q. Were they still in force when this accident had occurred?

"A. Yes."

James J. Brockwell, superintendent of streets and refuse collection for Petersburg, testified that drivers of trucks and their helpers were instructed to flag the trucks across the right of way. Special emphasis was placed upon the instructions to the drivers and helpers going from the city to the dump. No emphasis was placed on the instructions to the employees coming from the dump, because there was no obstruction to the view of trains coming from either direction when the crossing was approached from the north.

The testimony establishes the fact that the dump was not used by the general public, although Petersburg knew and raised no objection to the fact that pedestrians used the way and crossing to the dump "to pick up junk," or anything desired by them. Pedestrians using the dump under these circumstances were mere licensees.

██ Most of the foregoing evidence was introduced by plaintiff. Such restrictions of the use of a street or road are inconsistent with the common and accepted meaning of a "public way" which is "a way open to all the people without distinction for passage and repassage at their pleasure." 39 C. J. S., Highways, p. 909.

Section 15-6 of the 1950 Code authorizes incorporated cities and towns "to lay off streets, walks or alleys, alter, improve and light the same and have them kept in good order; * * * and to regulate the transportation * * * through * * * (its) * * * streets."

██ This delegation of authority by the General Assembly does not relieve a municipality of liability for negligence in permitting obstruction of its public streets and ways in such manner as unreasonably to impede the passage of users thereof.

"The authority of municipalities over streets, they derive, as they derive all their powers, from the legislature—from charter or statute. The fundamental idea of a street is not only that it is public, but public for all purposes of free and unobstructed passage, which is its chief and primary use." *Norfolk City* v. *Chamberlaine*, 29 Gratt. (70 Va.) 534.

In *McCoull* v. *Manchester*, 85 Va. 579, 8 S. E. 379, 2 L. R. A. 691, it appeared that plaintiff was seriously injured, and the horse he was riding was killed, when he rode into a pile of sand 4 feet high and 32 feet long, which a contractor had placed in the street for use in a building under construction on a lot adjacent to the street. The city defended the tort action brought against it for damages resulting from the accident on the ground that prior thereto the Council had adopted an ordinance permitting any person to place materials to be used in a building on a lot fronting on the street, provided that the material so placed did not occupy more than half of the used portion of the street. The trial court held that the ordinance in question constituted a complete defense to the action against the city. This court, on review, held that a municipality

could not escape the duty imposed upon it by law to keep the used portion of its streets in a reasonably safe condition for use by the public, by the adoption of an ordinance authorizing or permitting any one to obstruct the used portion of a public street without posting adequate warning signs or placing signal lights therein.

"It is well settled that public highways, whether they be in the country or in a city, belong, not partially, but entirely, to the public at large, and that the supreme control over them is in the Legislature. It is also an established general rule that any unauthorized obstruction which unnecessarily impedes or incommodes the lawful use of a highway is a public nuisance at common law." *Richmond* v. *Smith*, 101 Va. 161, 43 S. E. 345.

"The municipality must exercise reasonable care to keep in a safe condition for passage such public ways as are opened and intended by the municipality for general use, and over which the municipality exercises or may exercise full control, for their entire width." *Norfolk* v. *Travis*, 149 Va. 523, at pp. 528, 529, 140 S. E. 641, 56 A. L. R. 214.

The facts in *Radford* v. *Calhoun*, 165 Va. 24, 181 S. E. 345, 100 A. L. R. 1378, were that the city permitted a pile of concrete slabs 14 or 15 feet long and 3 feet wide to extend 16 inches into the paved and used portion of Norwood street. About nine o'clock at night plaintiff, driving a new Chevrolet automobile east along Norwood street, met another car traveling in or near the center of the street. Plaintiff, in order to avoid a head-on collision, swerved his car to the right and crashed into the pile of slabs. He recovered a judgment in the lower court against the city for the damages sustained by him in the collision. On review, the judgment was affirmed, and in the opinion delivered by Mr. Justice Eggleston, the duties imposed by law upon cities and towns to keep the used portion of streets free of obstructions were restated. He quoted, with approval, the following excerpts from former opinions:

" 'The public is entitled to the full and free use of all

the territory embraced within a highway in its full length and breadth * * *.' *Richmond* v. *Smith*, 101 Va. 161, 167, 43 S. E. 345, 346; *Richmond* v. *Pemberton*, 108 Va. 220, 226, 61 S. E. 787; *Appalachian Power Co.* v. *Wilson*, 142 Va. 468, 473, 129 S. E. 277."

" 'In cases of temporary necessity a municipality may allow obstructions on the public sidewalks or streets, but the traveling public should be warned of and protected against the same in some proper manner, and for failure to perform its duty the city is liable.' *Arthur* v. *Charleston*, 51 W. Va. 132, 41 S. E. 171; *Norfolk* v. *Johnakin*, 94 Va. 285, 289, 26 S. E. 830."

It follows that if the crossing in this case constitutes a link of a public way Petersburg had no right to maintain bars across it and keep the bars locked for more than half the time. Such blocking or obstruction of a way interferes with the free use thereof by the public. If it is necessary to place temporary bars or obstructions across a public way for legitimate purposes, it is the duty of the municipality to warn, in a proper manner, the users of the way of the existence of such bars or obstructions. These are well settled legal principles.

The facts in *Chesapeake, etc., Ry. Co.* v. *Faison*, 189 Va. 341, 52 S. E. (2d) 865, were that the railway company reopened an old grade crossing for the benefit of one Levinson, a landowner, for the purpose of giving him and his employees a convenient passage way from his farm to a hard-surfaced road which ran on the opposite side of the right of way. This grade crossing was reopened on condition that Levinson would erect a gate across the roadway just to the northern edge of defendant's right of way and keep the same locked at night to prevent its general use by the public. Faison, a taxicab driver, at night, turned into the road, of which the crossing was a connecting link, on the assumption that it was a public highway. He found the gate locked. In attempting to back his cab across the highway, he drove off the edge of the hard surface of the crossing.

His motor stopped, and before he could remove the cab from the tracks, it was struck and demolished by a passing train. This court held that, as a matter of law, the evidence was insufficient to prove the existence of a highway crossing.

The evidence in the case now under consideration proves that Petersburg has given permission to a number of merchants and manufacturers to use the city dump as a place for the disposal of their accumulated trash which is transported to the city dump over the crossing. However, Petersburg has consistently refused to permit the roadway and dump to be used by the general public. It exercises exclusive control over the key to the bars across the roadway. Truck drivers and helpers are specifically instructed to flag its trucks in safety over the crossing. No municipality has a right to so restrict the use of a public way within its corporate limits.

In view of the uncontradicted testimony as to the agreement between Petersburg and defendant when the crossing was constructed, and the consistent performance of the agreement thereafter, we are constrained to hold that the crossing in question is not a public highway within the meaning of the words "a * * * grade crossing of a public highway," as used in the statute. (Section 56-416 of the 1950 Code.)

The following evidence tends to strengthen this view. The record discloses that Chapter 25, sec. 1, of the Code of the city of Petersburg, provides that "no engine, car or other vehicle shall be * * * propelled upon any railroad * * * across any street of the city at a greater rate of speed than six miles per hour." It appears that defendant gave general instructions to its employees in charge of its trains passing over the crossing to proceed at the rate of 25 miles per hour. It is improbable that defendant would have authorized its employees to operate its trains at this rate of speed if it regarded this as a public crossing. It is likewise improbable that Petersburg would have permitted defendant's trains

to be operated at this rate of speed if it had regarded this as a public crossing.

We find no error in the decision of the trial court declaring that the crossing in question is not a link in a public highway. Inasmuch as the evidence for plaintiff clearly establishes the negligence of decedent, she is not entitled to recover in this action. It follows that it is unnecessary to consider the other assignments of error.

The judgment of the trial court is

*Affirmed*.