# Richmond

T. E. RITTER CORPORATION v. LIVY H. ROSE, ET AL.

SEABOARD AIR LINE RAILROAD v. LIVY H. ROSE, ET AL.

March 16, 1959.

Record Nos. 4891, 4892.

Present, All the Justices.

The opinion states the case.

*Spencer Gill* (*Rixey & Rixey*, on brief), for plaintiff in error, T. E. Ritter Corporation.

*E. L. Ryan, Jr.* and *John A. MacKenzie* (*White, Ryan & Reynolds; MacKenzie & Carr,* on briefs), for C. H. Lawson, Inc., and Seaboard Air Line Railroad.

*John A. MacKenzie* (*MacKenzie & Carr,* on brief), for plaintiff in error, Seaboard Air Line Railroad.

*E. L. Ryan, Jr.* (*Spencer Gill; White, Ryan & Reynolds; Rixey & Rixey,* on briefs), for C. H. Lawson, Inc., and T. E. Ritter Corporation.

No briefs were filed on behalf of Livy H. Rose, defendant in error.

SPRATLEY, J., delivered the opinion of the court.

These two appeals arise out of one proceeding. The same set of circumstances and the same parties are involved in each.

On April 28, 1956, about 9:30 a. m., a Seaboard Air Line Railroad passenger train collided with an earth mover or scraper at a point where a new highway was under construction over the tracks and right-of-way of the Railroad. The train consisted of seven coaches, including an express car, and was pulled by a diesel locomotive. The earth mover, owned by C. H. Lawson, Incorporated, a subcontractor of T. E. Ritter, Incorporated, was operated by its employee, R. E. Layman. The mover and its equipment weighed 45,000 pounds and had a carrying capacity of 19 tons of material. It was struck on its right side and almost completely demolished. Livy H. Rose, an employee of the Railway Express Agency, Incorporated, was riding in the express car at the time of the collision. The express car was derailed and, as a result, Rose was badly injured.

Rose sued T. E. Ritter Corporation, C. H. Lawson, Incorporated, and the Seaboard Air Line Railroad, alleging that his injuries were caused by the negligence of each and all of the defendants. The jury returned a verdict of $15,000 against all three defendants, and judgment was entered accordingly. The defendants will be hereinafter respectively referred to as Ritter, Lawson, and Railroad.

Ritter and Railroad sought and obtained writs of error. Lawson did not appeal. Ritter contended that the earth moving machine was being operated by Lawson, an independent contractor, and it had nothing to do with the operation; and that Railroad operated its

train in excess of lawful speed and without proper lookout. Railroad claims that the evidence fails to show that it was guilty of any negligence which was the proximate cause of the accident. Lawson, in its briefs, asks us to hold both Ritter and Railroad guilty of negligence.

The scene of the accident is in the City of Portsmouth. The new highway and cross-over were being constructed under a contract with the State Highway Department, Ritter being the general contractor for the entire project. Ritter had, on December 20, 1955, sublet the grading and sub-soil work on the project to Lawson, to be performed according to the plans, specifications and directions of the general contract. Lawson agreed to furnish all supervision, labor and materials, including equipment and incidentals required in the work sublet to it.

The weather at the time of the accident was clear, and the railroad tracks were straight for a mile west of the point of collision. The legal limit of speed for the train in the zone where the accident occurred was 45 miles per hour. There was no flagman on duty where the crossing was being constructed.

Work on the cross-over had been suspended during the winter; but a few days prior to the date of the accident, Lawson had resumed the grading of the street running over the right-of-way of Railroad. Its earth mover was being driven across the tracks from north to south when the collision occurred. The train was proceeding eastwardly.

The State not having title to the land occupied by the railroad tracks, Ritter procured a license from Railroad to construct and maintain a road crossing its property and tracks. Under this agreement, dated August 31, 1955, which was in effect at the time of the accident, Ritter, as licensee, contracted, in part, as follows:

"4. Licensee will, at all times, exercise, and will require its agents and employees using the crossing to exercise, extraordinary vigilance and care to avoid injury to persons or damage to property from equipment operated over the tracks of Railroad, and will not do nor permit anything to be done to or on said crossing to endanger the property or delay the equipment of Railroad.

"Licensee will use over the crossing only pneumatic-tired equipment so as to prevent damage to Railroad's right of way and tracks. Licensee will notify Railroad when it expects to move heavy equipment over the crossing and Railroad will, at Licensee's expense,

provide a flagman at the crossing during such periods, and Licensee will reimburse Railroad for the expense thus incurred.

"5. Licensee hereby assumes all risk of loss, cost, injury or damage growing out of the condition, maintenance or use of the crossing or the exercise or attempted exercise of the license herein granted. And Licensee will further at all times indemnify and save Railroad harmless from any and all claims and costs that may arise or be made for injury, death, loss or damage resulting to the Railroad's employees or property, or to other persons or their property, including the agents and employees of Licensee, by reason of the existence of this crossing."

Railroad wrote Ritter on December 13, 1955, that it had observed large quantities of dirt left on its tracks, and that tractors having lugs and cleats were being used rather than the pneumatic-tired equipment provided in the agreement. It requested Ritter to adhere to the agreement. On December 19, Ritter replied that the work was being done by its subcontractor, and that it had notified Lawson "in regards to the above matter." It further advised Railroad that the work was being shut down until March 1, and after that it would see that the agreement was carried out.

On January 17, 1956, Railroad asked Ritter to advise it how long a time was needed to complete the work after operations were resumed around the first of March. Ritter replied on January 19, 1956, that it did not expect to use the crossing until March 1, and should finish the job and use of the crossing by July 15, 1956. No notice, however, was given Railroad that work had been resumed at the crossing, nor was there any request at any time that a flagman be provided at the crossing when heavy equipment was being moved over it.

H. F. Kelly, engineer of the train, called as an adverse witness by the plaintiff, testified that as it approached the 45-mile zone in which the accident occurred, he reduced the speed of the train below 45 miles per hour, according to the train's speedometer, and applied his brakes preparing to enter a lower speed limit zone beyond; that when he was 200 or 300 feet from the point of the accident, the earth mover drove on the tracks; and that he immediately applied his emergency brakes, which operated properly, but he was unable to stop the train. He further said that before he saw the earth mover he had turned on his whistle and set the automatic bell, and both were in operation

at the time of the collision. The speed of the train was between 35 and 40 miles per hour when it struck the earth mover.

H. L. Brown, a fireman of the train, corroborated the testimony of Engineer Kelly as to speed, application of brakes, the blowing of the whistle and the ringing of the bell. He said the first time he saw the earth mover it was 200 or 300 feet away, and "it was right on the tracks." The conductor of the train, and its flagman, estimated the speed of the train at 45 miles or less when its brakes were applied.

Livy H. Rose, the plaintiff, said that the train was behind schedule but that he did not know its speed.

J. B. Rose, a member of the Police Force of the City of Portsmouth, who had had experience as a flagman and brakeman on another railroad, and was employed by Lawson to flag graders crossing a highway intersection near the point of the accident, said he saw the approaching train "possibly 200 feet, I would say, a rough estimate, before the impact." He first estimated its speed at "approximately 50 miles an hour." On cross-examination, when asked if that was not a guess, he replied: "Well, it would have to be. I mean I couldn't see his speedometer."

Harold Ritter, Vice-President of Ritter, testified that he was Superintendent of the entire project; that he knew it would be necessary to cross back and forth over the tracks of the Railroad with heavy equipment; that he did not know work had been resumed on the cross-over prior to April 28, 1956, or that the barricades which protected the crossing had been removed; that he gave no notice to Railroad when heavy equipment would be moved over the crossing, but if he had been using his own equipment, he would have given such notice in accordance with his agreement. He admitted that there was no flagman or watchman at the crossing. He testified that the earth mover was equipped with a "tremendous 'engine" and the exhaust was so noisy that one could not talk to its driver while it was in operation loud enough to be heard.

Richard E. Layman, the operator of the earth mover, said that he had been working on the job about two days; that the barricades formerly protecting the tracks had been removed; that he was under the impression that the tracks were railroad sidings; that, in the two days he had worked there, he had seen no trains pass except the one that struck his machine; that when he drove by some gas tanks on his right, "just guessing, 25 feet," from the tracks, he looked to his right and left and did not see any train coming; that when he got

on the tracks he saw the train about 50 feet from him, and "just guessing, I would say it was going 60 to 65 miles an hour." He jumped out of his seat, over the windshield, and ran to safety on the far side of the tracks, and remembered nothing thereafter. He said his earth mover was loaded and traveling at 3 or 4 miles an hour. He further added that he did not hear the whistle or bell of the train because of the loud noises made by the earth mover.

■ There is ample evidence to justify the finding that Ritter failed to exercise the duty and care required of it under the circumstances. It conclusively shows that Ritter knew and recognized the hazardous situation involved in constructing the crossing over railroad tracks. Under the written license granted Ritter, it was specifically provided that Ritter, "will, at all times, exercise, and will require its agents and employees using the crossing to exercise, extraordinary vigilance and care to avoid injury to persons or damage to property from equipment operated over the tracks * * *." Secondly, that Ritter would notify Railroad when it expected to move heavy equipment over the crossing, so that Railroad could, at Ritter's expense, provide a flagman during such periods. Surely the earth mover here involved was heavy equipment. The facts in this case prove the wisdom of the requirements of the agreement.

Ritter, and all other persons constructing the cross-over, irrespective of Ritter's agreement with Railroad, owed a common law duty to guard the hazardous situation created by the work, for the protection of the safety of persons lawfully using the premises. As licensee of the Railroad, the general contractor for the entire road project could not delegate his duty to another and thereby escape liability.

In *Epperson* v. *DeJarnette*, 164 Va. 482, 487, 180 S. E. 412, we approved the following statement from *Bower* v. *Peate*, L. R. 1 Q. B. Div. 321, (1876) where Cockburn, C. J., said:

" '[A] man who orders a work to be executed, from which, in the natural course of things, injurious consequences to his neighbor must be expected to arise, unless means are adopted by which such consequences may be prevented, is bound to see to the doing of that which is necessary to prevent the mischief, and cannot relieve himself of his responsibility by employing someone else—whether it be the contractor employed to do the work from which the danger arises, or some independent person—to do what is necessary to prevent the act he has ordered to be done from becoming wrongful.' "

The principle is aptly stated in Restatement of the Law of Torts—Negligence, § 416:

"One who employs an independent contractor to do work, which the employer should recognize as necessarily requiring the creation during its progress of a condition involving a peculiar risk of bodily harm to others unless special precautions are taken, is subject to liability for bodily harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions."

It is well settled in Virginia and elsewhere that one who engages an independent contractor to do work of an inherently hazardous character, or to use a dangerous instrument, from either of which, in the natural course of things, it is likely that injurious consequences to others may arise, unless all reasonable precautions be taken to the end that third persons may be protected against injury, is bound to see to the doing of that which is necessary to prevent the mischief, and cannot relieve himself of responsibility, if the independent contractor fails to exercise due care with respect to the performance of the work or the use of the dangerous instrumentality. *Richmond & Manchester Railway Co.* v. *Moore's Adm'r*, 94 Va. 493, 27 S. E. 70; *Southern Railway Co.* v. *Newton*, 108 Va. 114, 60 S. E. 625; *Bowers* v. *Town of Martinsville*, 156 Va. 497, 515, 159 S. E. 196; 9 M. J., Independent Contractors, § 16, page 637; 27 Am. Jur., Independent Contractors, § 39, page 517.

"It seems to be a well settled rule of the common law that a person who negligently uses a dangerous instrument, or article, or causes or authorizes its use by another in such a manner or under such circumstances that he has reason to know that it is likely to produce injury, is responsible for the natural and probable consequences of his act to any person injured who is not himself at fault. The liability does not depend upon privity of contract between the parties to the action, but on the duty of every man to so use his own property as not to injure the persons or property of others." *Standard Oil Co.* v. *Wakefield*, 102 Va. 824, 828, 47 S. E. 830.

In view of the conclusion we have reached, we find no merit in the remaining assignments of error by Ritter.

■ The evidence does not justify a finding that Railroad was guilty of negligence. The engineer of the train and other members of the train crew testified positively and directly that the speed of the train did not exceed 45 miles per hour immediately prior to the accident. The testimony of J. B. Rose was admittedly a guess.

The testimony of Richard E. Layman is even less acceptable. When distant 20 to 25 feet from the tracks, he failed to see an approaching train on the tracks straight for one mile to his right. He said he first saw it after he got on the tracks, and it was then only 50 feet distant, and approaching at an estimated speed of 60 to 65 miles per hour. In the fraction of the second it took the train to reach his machine, he estimated its speed, jumped out of his seat, over the windshield, ran by the front of the earth mover and escaped to a place of safety beyond the tracks.

We cannot allow guesses to prevail over positive testimony. *Butler v. Darden*, 189 Va. 459, 53 S. E. 2d 146. Nor are we required to give credit to that which is contrary to human experience and the laws of nature and mathematics. *Norfolk & Western Railway Co.* v. *Strickler*, 118 Va. 153, 86 S. E. 824.

For the foregoing reasons, we are of opinion to affirm the judgment of the trial court as to Ritter (Record No. 4891), and to reverse the judgment against Railroad (Record No. 4892), set aside the verdict of the jury, upon which that judgment is based, and enter final judgment here for Railroad.

*Affirmed in part and reversed in part.*