# 𝔖taunton

Wilbur T. Smith, Administrator, Etc. v. Herman Grenadier, Et Al.

August 31, 1962.

Record No. 5456.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, l'Anson and Carrico, JJ.

*Robert C. Fitzgerald* (*Thomas O. Lawson*, on brief), for the plaintiff in error.

*Norman F. Slenker* (*Charles H. Duff; Duff, Luther & Slenker*, on brief), for defendant in error, Herman Grenadier.

*A. Hugo Blankingship, Jr.* (*E. Waller Dudley; Boothe, Dudley, Koontz & Blankingship*, on brief), for appellee, Wayne Construction Company.

SNEAD, J., delivered the opinion of the court.

Wilbur T. Smith, administrator of the estate of Donald B. Smith, deceased, instituted an action against Ray Rainwater, Herman Grenadier and Wayne Construction Co., Inc. to recover $30,000 for the wrongful death of plaintiff's decedent. All defendants filed their grounds of defense and defendant Grenadier filed an affidavit denying that defendant Rainwater was his agent, servant or employee. At the conclusion of plaintiff's evidence all defendants moved to strike plaintiff's evidence. The motion was granted as to defendants Grenadier and Wayne Construction Co., Inc. and was refused as to defendant Rainwater. The jury returned a verdict for $20,000 against Rainwater and judgment was entered thereon. Rainwater has not appealed from the judgment and it is final as to him.

We granted plaintiff a writ of error to the court's action in striking his evidence and entering summary judgment for defendants Grenadier and Wayne Construction Co., Inc. Plaintiff's assignments of error challenge the correctness of this action of the court.

The Fairfax County School Board awarded Wayne Construction Co., Inc. hereinafter called Wayne, a contract, as general contractor,

to construct a public school known as "Mantua" on a site located in a residential area of the county where there was a baseball diamond. By written agreement, dated August 29, 1960, Rainwater agreed to perform for Wayne the excavating and grading on the project, according to plans and specifications, for $13,000. The contract provided that this sum included the cost for a "payment bond" which Rainwater was to furnish Wayne, as required by law. Section 11-23, Code 1950, as amended. In the performance of the work Rainwater used a heavy "Caterpillar pan" having four large wheels, which was propelled by a D-7 Caterpillar tractor, both of which were owned by Grenadier. On the rear of the tractor there was a power unit which operates the cables that raise and lower the bowl and apron of the pan. The operator controls their movement by two levers located beside the tractor seat. It is not necessary for the motor to be running in order to lower either the bowl or the apron. A slight forward movement of the levers will drop them. The undisputed evidence was that for safety reasons the operator should never leave the bowl off the ground or the apron up when the machine is not in operation. Rainwater had used this equipment on a prior job.

While Rainwater was operating the equipment at the job site around 9 a.m. on September 23, 1960, trouble developed with the master clutch on the tractor. He then moved the equipment to an undisclosed place on the premises, where he proceeded to make the repairs. About 4 p.m. he left the equipment unattended and went to a dealer to obtain replacement parts. He returned with them about 6 p.m. and during his absence plaintiff's decedent, Donald Smith, nine years of age, was crushed to death between the bowl and the apron, according to Edward Mills, a county fireman who was called to the scene. In any event, it was stipulated that his death "was caused by some motion of this machinery". There was evidence that the bowl was off the ground or in a traveling position while the clutch was being repaired.

Wayne employed a Mr. Stringer as superintendent for the project and as such he had "over-all supervision of the site." The record is silent as to whether he or any other employee of Wayne was on the site during Rainwater's absence. Rainwater had on occasions seen children "around the site." Under Rainwater's contract "all engineering and grades" were to be provided by Wayne. Wayne was responsible to the school board for the completion of the project in accordance with the plans and specifications.

Grenadier purchased the equipment involved for about $14,000 in

June, 1960, after having entered into a verbal agreement with Rainwater. Under this agreement Grenadier was to make the down payment and take title to the equipment in his name, and Rainwater was to use it and pay the monthly deferred payments of approximately $1,100 each as they became due. Rainwater said such payments were for "rent" of the equipment. When he was asked if he didn't lease the equipment he stated: "In effect, that's right". Grenadier was to retain title to the equipment after all payments had been made. The amount to be paid by Rainwater for the use of the equipment after the deferred payments had been made was not discussed. It was agreed that Grenadier would pay for any major repairs to the machinery. The repair to the clutch was considered a major repair and Grenadier paid for the necessary parts and Rainwater's time in making the repairs, both of which amounted to about $117. Rainwater used other equipment purchased by Grenadier under the same arrangements.

Rainwater was unable to secure a "payment bond" from a bonding company as his financial condition was not satisfactory to it. Such a bond guarantees to the general contractor that the subcontractor will make payments to all persons who perform labor and furnish materials on the job. Rainwater had a conference with officials of the general contractor concerning his inability to furnish the bond. According to Rainwater, they suggested "that perhaps Mr. Grenadier would be willing to take the contract and get the bond in his name." Wayne then mailed to Grenadier on October 13, a duplicate of the contract, dated August 29, 1960, it had with Rainwater except that the amount was $13,130 instead of $13,000 contained in Rainwater's contract. The difference was for the cost of the bond, because Rainwater said he had not figured that cost in his bid. Claude E. Keener, secretary and treasurer of Wayne, stated that the contract was for the purpose of assisting Rainwater in securing a bond. At that time Rainwater had performed the greater part of the work required under the contract.

Upon receipt of the contract, Grenadier called Rainwater and they conferred about it. Rainwater told Grenaider "that if he were, in effect, the subcontractor and he had the equipment for collateral, then they [bonding company] would issue a payment bond." Grenadier executed the contract with Wayne about the middle of October. Rainwater stated that he intended to submit Grenadier's contract to the bonding company in order to convince it that Grenadier was the subcontractor and had the "payment bond" issued in

Genadier's name. Rainwater completed the work and no bond was furnished Wayne by either Rainwater or Grenadier.

Plaintiff contends that under the evidence a jury question was presented as to whether the relationship of joint adventurers existed between Grenadier and Rainwater; whether the relationship of master and servant existed between them, and whether Wayne was negligent in not correcting the unsafe condition on the project site.

The court having struck plaintiff's evidence, we must view it and all reasonable inferences therefrom in the light most favorable to him. *Pike* v. *Eubank*, 197 Va. 692, 698, 90 S. E. 2d 821; *Mason and Dixon, Inc.* v. *Casualty Co.*, 199 Va. 221, 222, 98 S. E. 2d 702.

In 10 M. J., Joint Adventures, § 2, p. 695, it is stated:

"* * * A joint adventure exists when two or more persons combine in a joint business enterprise for their mutual benefit, with an express or implied understanding or agreement that they are to share in the profits or losses of the enterprise, and that each is to have a voice in its control and management. Another similarity between a partnership and a joint adventure is the fact that the parties must combine their property, money, efforts, skill, or knowledge, in some common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character.

"The distinction between a joint adventure and a joint enterprise is that the first is for profit and the second is not necessarily so."

In *Jackson Company* v. *City of Norfolk*, 197 Va. 62, 67, 87 S. E. 2d 781, we described a joint adventure as "a special combination of two or more persons, where in some specific undertaking of a business nature a profit or other gain or benefit is jointly sought without any actual partnership or corporate designation." *Horne* v. *Holley*, 167 Va. 234, 239, 188 S. E. 169, 171; *Jones* v. *Galleber & Co.*, 187 Va. 602, 609, 47 S. E. 2d 333. See 36 Va. L. Rev., p. 425 for a discussion of this subject.

Joint adventures are not established by operation of law, but are created by contracts, express or implied. Little formality is required. The conduct of the parties, as well as other facts and circumstances of a particular case, will often justify the inference that such a contract existed. 36 Va. L. Rev. *supra*, at pp. 432 and 434. The absence of an express agreement as to profits and losses is "no proof that there is no joint adventure." 10 M. J., Joint Adventures, § 3, p. 695.

Whether or not a given set of circumstances constitutes a joint adventure is generally a question for the jury under proper instruc-

tions. 10 M. J., Joint Adventures, § 3, p. 696. Where such a relationship exists, "each member is responsible for the negligent acts of another member which are within the scope and object of the joint undertaking." 30 Am. Jur., Joint Adventures, § 56, p. 982. "As in a partnership, each member of a joint adventure has the dual status of principal for himself and agent for his associates, within the scope of the enterprise." *Jackson Company* v. *City of Norfolk, supra,* 197 Va. at p. 67.

Grenadier argues that the plaintiff's evidence conclusively shows that a community of interest in the object and purpose of the undertaking did not exist; that there was no right of control by him of the work performed, and that he did not share in the profits. The failure to establish these elements, he says, precludes a relationship of joint adventure.

As has been stated, Wayne entered into a written contract with Rainwater, dated August 29, 1960, whereby Rainwater agreed to perform the excavating and grading on the job, and a similar contract, dated the same day, was executed by Grenadier and Wayne in the middle of October. It is true that the testimony of Keener was that the latter agreement was executed for the purpose of assisting Rainwater in securing a "payment bond" for Wayne. Rainwater stated it was for the purpose of convincing the bonding company that Grenadier was the subcontractor and to secure the bond in his name. He also stated that officials of Wayne suggested to him "that perhaps Mr. Grenadier would be willing to take the contract and get the bond in his name." Suffice it to say an unusual situation was created. Yet, the contracts which were introduced show on their face that each had a contract to perform the work for Wayne. Clearly, these contracts had evidentiary value and the jury would not be bound to accept the explanation of either Keener or Rainwater. They could conclude that Grenadier and Rainwater were doing the work jointly and each had a right to the control and management of the project, and that a community of interest in the object and purpose of the undertaking existed between them.

Under the verbal agreement between Rainwater and Grenadier, Rainwater was to make the monthly payments on the equipment, which property Grenadier would retain as his own when all payments had been made. Any amounts received by Rainwater after payment on the notes and expenses were his profit. By the arrangement, Grenadier was getting the equipment paid for, which the jury could find was a profit or benefit to him derived from the project. Thus

we cannot say, as a matter of law, a joint adventure did not exist. The evidence and reasonable inferences therefrom presented a jury question on this issue.

■ We turn next to the issue of whether the evidence was sufficient to constitute a jury question as to whether the relationship of master and servant existed between Grenadier and Rainwater.

"* * * At common law, upon the question of whether the relationship of master and servant exists, there are four elements which are considered: (1) selection and engagement of the servant; (2) payment of wages; (3) power of dismissal; and (4) the power of control of the servant's action. * * *.

"But, * * * the first, second and third of these elements are not essential to the relationship. The 'power of control' is the most significant element bearing on the question, * * *." *A. C. L. R. Co.* v. *Tredway's Admx.*, 120 Va. 735, 744, 745, 93 S. E. 560; *Baker* v. *Nussman*, 152 Va. 293, 303, 147 S. E. 246; *Tidewater Corp.* v. *McCormick*, 189 Va. 158, 166, 52 S. E. 2d 61. See also 12 M. J., Master and Servant, § 3, pp. 458, 459.

In determining whether the relationship of master and servant exists, it is immaterial whether one exercises the power of control of the servant in the performance of his work. The ordinary test is, does he have that right. *Ross* v. *Schneider*, 181 Va. 931, 939, 27 S. E. 2d 154; *Texas Company* v. *Zeigler*, 177 Va. 557, 565, 14 S. E. 2d 704. Right of control "may be inferred from various evidentiary facts." *Barber* v. *Textile Machine Works*, 178 Va. 435, 441, 17 S. E. 2d 359.

Where the measure of compensation is based upon time or piece the workman is usually a servant, and where it is premised upon a "lump sum" for the work he is usually a contractor. *Ross* v. *Schneider, supra*, 181 Va. at p. 940.

The doctrine of respondeat superior "is based on the proposition that he who expects to derive advantage from an act which is done by another for him must answer for an injury sustained by a third person from that act." 12 M. J., Master and Servant, § 97, p. 599. See *Drake* v. *Laundry Corp.*, 135 Va. 354, 360, 116 S. E. 668.

Here, the evidence shows that it was Grenadier's responsibility and obligation to pay for major repairs to his equipment; that Rainwater was in the process of making repairs to the tractor, which was unattended at the time, when some motion of the machinery caused the death of plaintiff's decedent, and that, in accordance with the prior arrangement with Grenadier, Rainwater was reimbursed for

the replacement parts and also was paid for his time spent in making the repairs.

From this evidence and other facts and circumstances disclosed by the record, the jury could conclude that at the time of the accident Grenadier had the right to control Rainwater's actions in the performance of his work and was his servant or employee. Thus, we hold that this issue should have been submitted to the jury under proper instructions.

■ Finally, plaintiff contends that the court should have submitted to the jury the question of whether Wayne, the general contractor, was charged with knowledge of the negligent condition that existed and was primarily negligent in not correcting it.

The general rule is that an employer of an independent contractor is not liable for injuries to third persons caused by the negligence of the independent contractor or his servants, 33 A. L. R. 2d § 2, p. 11. There are, however, exceptions to the general rule, such as where the torts of the contractor arise directly out of work that is wrongful *per se*, or a nuisance or inherently dangerous. See *Richmond* v. *Sitterding*, 101 Va. 354, 359, 43 S. E. 562; *Epperson* v. *DeJarnette*, 164 Va. 482, 486, 180 S. E. 412.

*Stagg* v. *Taylor*, 119 Va. 266, 89 S. E. 237, involved an action brought by the administrator of Taylor against Stagg, the general contractor, and Woodson, the subcontractor, for the death of plaintiff's decedent caused by the removal of forms supporting a concrete roof while it was green by the subcontractor. A superintendent was employed by the general contractor for the purpose of seeing that the entire work was done according to the terms of the contract. The general contractor was held not liable for Taylor's death. There we said:

"The mere fact of undertaking to build a house, either as owner or as general contractor (subject to certain exceptions not material here) does not place such owner or contractor in a position of liability for injuries resulting from the negligence of those in charge of the work. To establish such liability against the owner or contractor, it must be shown that the relationship of master and servant exists (*Emmerson* v. *Fay*, 94 Va. 60, 62, 26 S. E. 386) and this rule applies to subcontractors who engage to do only part of the construction work. *Richmond* v. *Sitterding*, 101 Va. 354, 358, 42 [43] S. E. 562, 65 L. R. A. 445, 99 Am. St. Rep. 879; 26 Cyc. 1552; note to *Stone* v. *Cheshire R. R. Corp.*, 51 Am. Dec. 201. The reservation of the right of supervision by the owner or contractor, or his representative, for

the purpose of seeing that the specific work is done in compliance with the contract, does not affect the rule, so long as this supervision relates, as in this case, only to results and not to the method of doing the work. *Bibb's Adm'r* v. *N. & W. R. Co.*, 87 Va. 711, 750, 14 S. E. 163; 26 Cyc. 1549, 1550; *Powell* v. *Construction Co.*, 88 Tenn. 692, 13 S. W. 691, 17 Am. St. 928." 119 Va. at page 269.

Here, the injury was not the natural result of the work contracted to be done and the work could have been accomplished without causing the injury. Rainwater was not performing any part of the contract with Wayne when the unfortunate accident occurred. Rainwater's negligence was collateral to the work. He was making repairs to the tractor over which Wayne had no control. Moreover, there has been no showing that the work contracted to be done was wrongful *per se*, a nuisance or inherently dangerous. No evidence was introduced to show that the equipment was inherently dangerous. Wayne was not under a non-delegable duty. Its job superintendent had "over-all supervision of the site", but it is not shown that he had the right to exercise or did exercise any control over Rainwater's method of doing the excavating work.

The record is devoid of any evidence that Rainwater was in the habit of leaving the bowl of the pan in an upright position or was regarded as an unsafe operator; that any of Wayne's employees had ever seen the bowl left by Rainwater off the ground, and that the injury was forseeable. The evidence does not show that the superintendent or any other employee of Wayne was on the job site at 4 p.m., when Rainwater left the equipment unattended to secure parts for the repairs. Furthermore, Wayne was under no duty to supervise, for the purpose of preventing collateral torts of Rainwater, the progress of the work he had contracted to do. *Bibb's Adm'r* v. *N. & W. R. R. Co. supra*, 87 Va. 711, 725, 726, 14 S. E. 163; 27 Am. Jur., Independent Contractors, § 35, p. 513. The trial court properly ruled, as a matter of law, that Wayne was not guilty of actionable negligence.

Plaintiff relies heavily upon *Ritter Corporation* v. *Rose*, 200 Va. 736, 107 S. E. 2d 479. The facts in it are clearly distinguishable from those in the case at bar; the case is, therefore, not controlling here.

For the reasons stated, the judgment appealed from is

*Affirmed in part;*
*reversed in part*
*and remanded.*